## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

## WEST PALM BEACH DIVISION

| | |
|---|---|
| XLG HOLDINGS, LLC, a Delaware limited liability company; CPC XTREME CO-INVEST, LLC, a Delaware limited liability company; REPUBLIC CAPITAL CORPORATION d/b/a MSOUTH CAPITAL, a Delaware corporation; and XTREME HOLDCO, LLC, a Delaware limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW MARC MOUTTET, individually; MATTHEW MARC MOUTTET, as Trustee of the MATTHEW MARC MOUTTET REVOCABLE TRUST; KELLI MOUTTET; DONALD BURNS WESTON; BRYAN CRAIG VAUGHAN; CHAMPION LAWN & GARDEN, LLC, a Florida limited liability company; and JOHN DOES 1–10, <br><br> Defendants. | Case No.: 9:26-cv-80556 <br><br><br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**Plaintiffs, XLG HOLDINGS, LLC ("XLG Holdings"); CPC XTREME CO-INVEST, LLC ("CPC Xtreme Co-Invest"); XTREME HOLDCO, LLC ("Xtreme Holdco"); and REPUBLIC CAPITAL CORPORATION d/b/a MSOUTH CAPITAL ("MSouth"; collectively with XLG Holdings, CPC Xtreme Co-Invest, and Xtreme Holdco, "Plaintiffs"), sue Defendants MATTHEW MARC MOUTTET, individually and as Trustee of the Matthew Marc Mouttet Revocable Trust; KELLI MOUTTET; DONALD BURNS WESTON; BRYAN CRAIG VAUGHAN; CHAMPION LAWN & GARDEN, LLC; and JOHN DOES 1–10, and allege:**

## PRELIMINARY STATEMENT

1.　　This case arises from a scheme to defraud investors and a senior secured lender through a rigged sale of a large-scale commercial landscaping company, followed by a systematic post-closing extraction of value by the same retained CEO, Defendant Matthew Mouttet, and his insider coconspirators — conduct that directly diminished the Howey-securities[1] purchased by Plaintiffs and dissipated the collateral securing Plaintiff MSouth's loan.

2.　　On October 12, 2021, Xtreme Landscaping & Grounds Maintenance, LLC ("Xtreme Landscaping" or "Xtreme"), a Delaware limited liability company newly formed to acquire the business, purchased the landscaping assets of Champion Lawn & Garden, LLC d/b/a Xtreme Landscaping ("Champion") from Champion pursuant to that certain Asset Purchase Agreement dated October 12, 2021 (as amended, the "APA"). The purchase was financed through:(i) senior secured term loan facilities totaling $20,830,000 from MSouth Capital (as Agent and Lender) to Xtreme Landscaping (guaranteed by Xtreme Landscaping's sole member, Xtreme Holdco, LLC) under the October 12, 2021 Loan and Security Agreement; and (ii) equity contributions aggregating approximately $11 million funded up the chain through Plaintiff XLG Holdings, LLC (which acquired a 60% membership interest in Xtreme Holdco), Plaintiff CPC Xtreme Co-Invest, LLC (holding 70.52% of XLG Holdings at closing), and Plaintiff MSouth (holding 29.48% of XLG Holdings at closing, since redeemed). Champion retained a 40% rollover interest in Xtreme Holdco, with that interest held by Defendant Mouttet through Champion. The

---

[1] The phrase "Howey-securities" refers to transactions qualifying under the seminal legal standard for determining whether a transaction is a security under securities law.

aggregate consideration of $29,540,409 was priced on represented trailing-twelve-month EBITDA of $3,610,000. That EBITDA was a fabrication.

3.        Again, the architect of this fraud was Defendant Matthew Marc Mouttet ("Mouttet"), Xtreme's founder and principal. For years before the sale, Mouttet ran a shadow or "cash-under-the-table" payroll operation, using—at least in substantial part—personal funds he obtained via unknown, but believed to be illicit, means. During this time, Mouttet, conspiring with other Defendants, paid nearly all would-be overtime wages in cash, as part of their scheme to artificially deflate the company's labor costs and thereby inflate the company's EBITDA.

4.        Mouttet also used a related company he controlled — Champion Lawn & Garden, LLC ("Champion"), which was Champion's same pre-sale legal entity now recast as a passive rollover holder — as a vehicle for post-closing defalcation of cash from Xtreme Landscaping. After the October 2021 closing, Mouttet caused Xtreme Landscaping to pay Champion for fictitious or inflated "materials" purchases while Mouttet controlled Champion as the receiving entity, directly draining Xtreme Landscaping's operating cash — cash in which Plaintiff MSouth held a perfected security interest under the October 12, 2021, Loan and Security Agreement. The source of the cash Mouttet used for the pre-closing off-books payroll remains unknown to Plaintiffs and is reasonably believed to have been obtained through illicit means.

5.        At the same time, Mouttet presented a due diligence "add-backs" schedule to Plaintiffs' advisors that disclosed certain personal expenses he had run through the business — his BMW, his wife Kelli's personal gas charges, personal health and car insurance, and home utilities — totaling $186,619.71. This selective disclosure was crafted to appear cooperative and transparent while drawing attention away from the far larger labor-cost manipulation, which of course was never disclosed at all. Plaintiffs did not discover, and even in the exercise of reasonable

diligence could not have discovered, the fraud described herein until 2025, when a former Xtreme insider came forward and disclosed the conduct described herein.

6.      Mouttet also intentionally misrepresented Xtreme's customer pipeline. In a March 2021 communication to the deal broker, Mouttet touted millions of dollars in accounts he claimed were being onboarded, six new accounts exceeding $1 million each that were supposedly merely waiting on James Schumacher's[2] involvement, and a single account called "Tradition" worth an estimated $3.5 million in annual revenue that he claimed was imminent. The formal due diligence package presented a contract list projecting $18.7 million in first-year revenues. The accounts receivable schedule represented $1,856,467 in fully collectible balances. The equipment schedule listed a fleet of trucks, mowers, and trailers with specific VINs as Xtreme-owned assets. All of these representations, Plaintiffs would later discover, were materially false and misleading.

7.      After the October 13, 2021, closing, Mouttet remained as CEO of Xtreme Landscaping and promptly converted his position of trust into a personal enrichment vehicle, directly injuring Plaintiff MSouth's collateral and directly diminishing the value of the Howey-securities purchased by Plaintiffs XLG Holdings and CPC Xtreme Co-Invest. The accounting records of Xtreme Landscaping document the scope of the looting with specificity. Between November 2021 and February 2023, a "Due from Related Party" account in Xtreme Landscaping's books accumulated a balance of $1,105,200.07 representing company funds diverted for Mouttet's personal and unauthorized benefit. This ledger records — with transaction-level detail —

---

[2] Schumacher was a former senior executive at Castle Group, one of the largest property management companies in Florida, whom Mouttet described as having "insane reach" in the industry and the ability to bring in accounts "immediately" — as a transformative new Xtreme executive who was already generating new account pipeline.

Mouttet's children's soccer registration fees charged to the company; wire transfers to his personal lawyers; $290,673 in temporary staffing invoices from Tee-Off Temps diverted to support "Xtreme Landscaping HD," a competing residential landscaping company that Mouttet personally funded and spun off through his employee Donny Weston; nearly $200,000 in equipment rentals for that same competing venture; $20,000 in fuel diverted to the competing company; $40,360 in dump fees for cleaning Mouttet's personal Boynton Beach property; and two direct checks totaling $100,000 paid to Donny Weston's competing enterprise. All of this was accomplished without authorization from, or disclosure to, Plaintiffs.

8.      In a now-apparent effort to insulate his personal assets from the consequences of his fraud, on March 11, 2022, Mouttet transferred his personal residence into the Matthew Marc Mouttet Revocable Trust, of which he is sole trustee, in a textbook fraudulent transfer designed to place the asset beyond creditors' reach.

9.      Plaintiffs bring this action for compensatory damages exceeding $30,000,000, treble damages under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), and the Florida Civil RICO statute, Fla. Stat. § 772.104, punitive damages, avoidance of the fraudulent transfer, pre-judgment attachment of Mouttet's assets, and all other appropriate relief.

## THE PARTIES

**Plaintiffs**

10.      Plaintiff XLG Holdings, LLC ("XLG Holdings") is a Delaware limited liability company. At the October 13, 2021 closing, XLG Holdings acquired a 60% member interest in

Xtreme Holdco, LLC, the 100% parent of Xtreme Landscaping & Grounds Maintenance, LLC; that interest is currently 51.34% following the post-closing Redemption Agreement — Xtreme Holdco, with Defendant Champion's passive rollover interest in Xtreme Holdco correspondingly increasing from 40% at Closing to 48.66% currently as a result of the same Redemption Agreement. At closing, the members of XLG Holdings were Plaintiff, CPC Xtreme Co-Invest, LLC (70.52%) and Plaintiff, MSouth (29.48%, representing a $3,250,000 equity investment). Effective on or about the date of the executed Redemption Agreement — XLG (date to be confirmed), MSouth's 29.48% equity interest in XLG Holdings was redeemed and converted to debt obligations of Xtreme Landscaping, and CPC Xtreme Co-Invest is currently the holder of 100% of XLG Holdings' common membership interests. XLG Holdings was induced by Mouttet's fraud to acquire the Xtreme Holdco interest and has sustained direct, personal losses as purchaser of that security in an amount to be proven at trial but including the difference between the $29,540,409 purchase price and the true value of the Xtreme Holdco interest.

11.     Plaintiff CPC Xtreme Co-Invest, LLC ("CPC Xtreme Co-Invest") is a Delaware limited liability company. At closing, CPC Xtreme Co-Invest held 70.52% of the common membership interests of XLG Holdings and funded XLG Holdings' acquisition of the 60% Xtreme Holdco interest. CPC Xtreme Co-Invest currently holds 100% of XLG Holdings' common membership interests. CPC Xtreme Co-Invest purchased a Howey-security in XLG Holdings and was induced by Mouttet's misrepresentations to make its capital contribution, sustaining direct, personal losses as purchaser.

12.     Plaintiff Republic Capital Corporation d/b/a MSouth Capital ("MSouth") is a Delaware corporation with its principal office at 3050 Peachtree Road NW, Suite 550, Atlanta, Georgia 30305. MSouth holds two independent direct injury positions: (i) at closing on October

13, 2021, MSouth purchased a 29.48% equity interest in XLG Holdings for $3,250,000 (since redeemed and converted to debt pursuant to the Redemption Agreement — XLG) — a Howey-security purchase giving rise to purchaser standing under Section 10(b) and fraud-in-inducement standing; and (ii) MSouth is the senior secured lender to Xtreme Landscaping under that certain Loan and Security Agreement dated October 12, 2021 (as amended from time to time, the "Loan and Security Agreement"), guaranteed by Xtreme Holdco, with term loan and delayed-draw term loan commitments aggregating $20,830,000 — pursuant to which MSouth holds a perfected security interest in all assets of Xtreme Landscaping and Xtreme Holdco, including all General Intangibles. In addition to its lender and original-equity positions, MSouth was contractually integrated into the governance of Xtreme Holdco under the September 9, 2021 Operating Agreement of Xtreme Holdco, LLC: (a) under Section 5.09, no Manager could be removed without MSouth's prior written approval; (b) under Section 5.10, no Manager vacancy could be filled without MSouth's prior written approval; (c) under Section 7.01 and Section 7.03, MSouth had the right to participate (in person or virtually) in, and to receive notice of, every meeting of Members; (d) under Section 12.09, MSouth had the right to compel XLG Holdings to exercise its right of first refusal or its tag-along rights at the Xtreme Holdco level; and (e) under Section 12.10, Defendant Mouttet, as the sole owner of Champion Lawn & Garden, LLC, was contractually prohibited from selling all or any part of his ownership interest in Champion without MSouth's prior written consent. MSouth was thus a contractually recognized governance participant in the post-closing capital structure, holding veto and observation rights specifically designed to protect against the conduct in which Defendants engaged. Following Mouttet's removal, MSouth's designee Glen Devane served as Interim Controller of Xtreme Landscaping and ultimately caused Xtreme Landscaping to file for Chapter 11 bankruptcy protection on May 24, 2024.

13.     Plaintiff Xtreme Holdco, LLC ("Xtreme Holdco") is a Delaware limited liability company. Xtreme Holdco is the sole member and 100% parent of Xtreme Landscaping & Grounds Maintenance, LLC and is the guarantor of the October 12, 2021, Loan and Security Agreement. Xtreme Holdco was directly injured by Mouttet's pre-closing misrepresentations, including misrepresentations affecting the earnout and deferred-payment rights at the Xtreme Holdco level, and by Mouttet's post-closing diversions of cash from Xtreme Landscaping that diminished the value of Xtreme Holdco's sole asset and triggered guaranty exposure under the Loan and Security Agreement.

**Defendants**

14.     Defendant Matthew Marc Mouttet is an individual residing in Palm Beach County, Florida. Mouttet resides at 8835 Parkland Bay Drive, Parkland, Florida 33076. Mouttet is the founder and former 100% owner of Xtreme, who sold 60% of the company to Plaintiffs while retaining 40% equity through his entity Champion Lawn and Garden, LLC and serving as CEO post-closing. Mouttet is the sole trustee of the Matthew Marc Mouttet Revocable Trust.

15.     Defendant Matthew Marc Mouttet, as Trustee of the Matthew Marc Mouttet Revocable Trust, is named in his representative capacity as trustee of the trust to which he fraudulently transferred his personal residence on or about March 11, 2022.

16.     Defendant Kelli Mouttet is an individual residing in Palm Beach County, Florida, and the spouse of Matthew Marc Mouttet. Kelli Mouttet was maintained on Xtreme's payroll of at least $30,000 per year post-closing and was complicit in the conversion alleged herein.

17.     Defendant Champion Lawn & Garden, LLC ("Champion") is a Florida limited liability company controlled by Mouttet. Pre-transaction, Champion was a Mouttet-controlled

entity doing business as "Xtreme Landscaping." Post-transaction, Champion became the passive holding entity for Mouttet's 40% equity stake in Xtreme Holdco, LLC (valued at $7,302,940) and was then repurposed by Mouttet as a vehicle for post-closing imbezzlement through fictitious materials invoicing. Notably, in Xtreme's Chapter 11 bankruptcy proceeding (Case No. 2:24-bk-00747-FMD), Champion registered as a creditor under the name 'Champion Lawn & Garden, LLC d/b/a Xtreme Landscaping,' in care of Mouttet's personal law firm Shir Law -- revealing that Mouttet's entity was operating under Xtreme's own trade name while asserting monetary claims against the company it had helped loot.

18.     Defendant Donald ("Donny") Burns Weston ("Weston") is an individual believed to reside in Palm Beach County, Florida. Weston has been a friend of Mouttet since high school. Weston served as Vice President of Design at Xtreme prior to and following the October 2021 closing. In approximately March 2022, Weston departed Xtreme and formed Xtreme Landscaping HD ("Xtreme HD"), a competing residential landscaping enterprise that Mouttet personally funded with Xtreme's resources. Weston received direct payments from Xtreme's accounts totaling at least $100,000 for the benefit of Xtreme HD and participated in the post-closing diversion of company assets as described herein.

19.     Defendant Bryan Craig Vaughan ("Vaughan") is an individual believed to reside in Palm Beach County, Florida. Vaughan served as Director of Operations at Xtreme following the closing October 2021. Prior to joining Xtreme, Vaughan was a branch manager at Yellowstone Landscaping and was instrumental in recruiting key Yellowstone personnel to Xtreme — a campaign that drew a legal response from Yellowstone. Vaughan had direct knowledge of Mouttet's operational practices, received an unauthorized $95,000 company-financed truck, and participated in the post-closing mismanagement and asset diversions described herein.

20.     Defendants John Does 1-10 are individuals whose identities are presently unknown who participated in or aided the fraudulent scheme alleged herein, including but not limited to employees or agents who assisted with the cash payroll scheme, the mail interception scheme, or the post-close asset diversions.

## JURISDICTION AND VENUE

21.     Federal Question Jurisdiction — Standard. This Court has federal question jurisdiction under 28 U.S.C. § 1331. Federal question jurisdiction exists when a civil action arises under the Constitution, laws, or treaties of the United States. A case arises under federal law when "federal law creates the cause of action asserted," or when "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 27–28 (1983). Under the well-pled complaint rule, the federal question must appear on the face of the plaintiff's complaint. *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908). This action presents multiple independent federal grounds for subject-matter jurisdiction, each of which separately satisfies § 1331.

22.     **Federal RICO — 18 U.S.C. §§ 1961–1968.** Section 1964(c) of the Racketeer Influenced and Corrupt Organizations Act expressly creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Civil RICO actions arise under federal law within the meaning of 28 U.S.C. § 1331, and federal courts have original subject-matter jurisdiction over civil RICO claims. *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). Plaintiffs assert two independent RICO violations under 18 U.S.C. §§ 1962(c) and 1962(d), each of which independently confers federal question jurisdiction. The RICO claims require this Court to adjudicate the meaning of "enterprise" and "pattern of racketeering

activity" as defined in 18 U.S.C. § 1961, the elements of the federal predicate offenses of wire fraud under 18 U.S.C. § 1343, mail fraud under 18 U.S.C. § 1341, and bank fraud under 18 U.S.C. § 1344, and the causation, standing, and injury requirements of 18 U.S.C. § 1964(c) as interpreted by the Supreme Court and the Eleventh Circuit — all matters of federal law independently supplying federal question jurisdiction.

23.     **Securities Exchange Act — 15 U.S.C. § 78j(b) and Rule 10b-5.** Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, prohibit the use of any manipulative or deceptive device or contrivance in connection with the purchase or sale of any security. Section 27 of the Exchange Act, 15 U.S.C. § 78aa, vests in the federal district courts *exclusive* original jurisdiction over all suits brought to enforce any liability or duty created by the Exchange Act or rules thereunder. Plaintiffs allege that the equity interests acquired in the Xtreme transaction constitute "investment contracts" and therefore "securities" within the meaning of Section 3(a)(10) of the Exchange Act, as defined in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Defendants made material misrepresentations in connection with Plaintiffs' purchase of those interests in violation of Section 10(b) and Rule 10b-5, over which this Court has exclusive federal jurisdiction. Even if the Exchange Act claims ultimately fail on the merits, the jurisdictional predicate is established by their good-faith assertion. *Bell v. Hood*, 327 U.S. 678, 682–83 (1946).

24.     **Supplemental Jurisdiction.** This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because all claims form part of the same case or controversy under Article III. All state law causes of action arise from the same nucleus of operative fact as the federal claims: Defendants' multi-year scheme to defraud Plaintiffs through the fraudulent inducement of the Xtreme acquisition and the systematic post-closing looting of the

acquired company. See *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). The state law claims do not substantially predominate over the federal claims, and no exceptional circumstances counsel against the exercise of supplemental jurisdiction. See 28 U.S.C. § 1367(c).

25.     Alternative Diversity Jurisdiction — Pled in the Alternative. In the alternative to federal-question jurisdiction pled above, Plaintiffs invoke this Court's diversity jurisdiction under 28 U.S.C. § 1332. For purposes of diversity jurisdiction, a limited liability company's citizenship is determined by the citizenship of each of its members. *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004). Plaintiffs acknowledge that the citizenship of certain of the Plaintiff LLCs may include members who are Florida citizens such that complete diversity may be incomplete; this allegation is made under Federal Rule of Civil Procedure 8(d)(2) in the alternative to the independent federal-question grounds  pled above and is not the primary basis on which subject-matter jurisdiction is invoked.

26.     The Plaintiff limited liability companies — XLG Holdings, LLC; CPC Xtreme Co-Invest, LLC; and Xtreme Holdco, LLC — are each Delaware limited liability companies. Plaintiff Republic Capital Corporation d/b/a MSouth Capital is a Delaware corporation with its principal place of business in Georgia. Each Defendant Matthew Marc Mouttet (individually and as Trustee of the Matthew Marc Mouttet Revocable Trust), Kelli Mouttet, Donald Burns Weston, and Bryan Craig Vaughan is a citizen of Florida, and Defendant Champion Lawn & Garden, LLC is a Florida limited liability company whose sole member, Matthew Marc Mouttet, is a citizen of Florida. The amount in controversy exceeds $75,000 exclusive of interest and costs.

27.     Each individual Defendant is a citizen of Florida. Defendant Champion Lawn & Garden, LLC is a Florida limited liability company whose sole member, Mouttet, is a citizen of Florida.

28.     The amount in controversy exceeds $75,000, exclusive of interest and costs. Diversity is asserted in the alternative only, as Plaintiffs' federal-question and supplemental jurisdiction grounds under 28 U.S.C. §§ 1331 and 1367 are independent and sufficient on their own.

29.     **Venue.** Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including the negotiation of the Purchase Agreement, the conduct of due diligence, the closing of the transaction, and all of the post-closing diversions and misappropriations described herein. Venue is also proper under 18 U.S.C. § 1965(a), which independently authorizes RICO civil actions in any district where any Defendant resides, is found, has an agent, or transacts his affairs; all individual Defendants reside in the Southern District of Florida. For the Exchange Act claims, venue is proper pursuant to 15 U.S.C. § 78aa in any district where any act or transaction constituting the violation occurred, including this District.

## FACTUAL ALLEGATIONS

### I. The Transaction and the Fraudulent Inducement Scheme

### A. Background and the Sale Process

30.     Prior to October 12, 2021, Defendant Matthew Marc Mouttet operated a large-scale South Florida commercial landscaping business through Defendant Champion Lawn & Garden, LLC, a Florida limited liability company, doing business as "Xtreme Landscaping" and serving homeowners' associations, condominium associations, and high-rise residential buildings across Palm Beach and Broward Counties. At the time of sale, the business employed approximately

200+ people and operated a fleet of over 70 commercial trucks. On October 12, 2021, the landscaping assets of that business were sold to Xtreme Landscaping & Grounds Maintenance, LLC, a Delaware limited liability company newly formed to acquire and operate the business post-closing. References in this Complaint to "Xtreme" or "Xtreme Landscaping" refer to Xtreme Landscaping & Grounds Maintenance, LLC, the Delaware LLC post-closing operator, except where the context clearly indicates reference to the pre-sale operation of Champion d/b/a Xtreme Landscaping.

31.     In September 2020, Mouttet caused Xtreme to acquire the customer accounts and assets of Treasure Coast Landscaping ("Treasure Coast"), adding a significant book of Boca Raton and Boynton Beach HOA contracts to Xtreme's portfolio and a Boynton Beach equipment yard.

32.     Plaintiff CPC Xtreme Co-Invest, LLC ("CPC Xtreme Co-Invest") is a Delaware limited liability company. At closing, CPC Xtreme Co-Invest held 70.52% of the common membership interests of XLG Holdings and funded XLG Holdings' acquisition of the 60% Xtreme Holdco interest. CPC Xtreme Co-Invest currently holds 100% of XLG Holdings' common membership interests. CPC Xtreme Co-Invest purchased a Howey-security in XLG Holdings and was induced by Mouttet's misrepresentations to make its capital contribution, sustaining direct, personal losses as purchaser.

33.     A formal letter of intent was executed in December 2020. What Plaintiffs believed to have been a comprehensive due diligence process ensued, during which Mouttet and his representatives made numerous representations concerning Xtreme's financial condition, customer relationships, accounts receivable, equipment, and growth pipeline.

34.     On March 24, 2021, during an apparent moment of deal hesitation, Mouttet wrote a letter to the deal broker in which he described his business position and, critically, made a series of affirmative representations about Xtreme's pipeline and growth prospects.

35.     In that letter, Mouttet stated that he had *"millions of dollars in accounts being onboarded"* and that he and James Schumacher had already identified *"6 new million dollar+ accounts that are just waiting for the green light."* Mouttet specifically claimed that "Tradition" — a particular community account he stated he had been pursuing for three years — was imminent and would generate *"$3.5 million base + extras"* alone.

36.     These representations were made with knowledge that they would be reviewed by the Plaintiffs and their advisors and were designed to induce the Plaintiffs to proceed with the transaction and agree to the purchase price.

37.     The parties executed a purchase agreement following an amended letter of intent in April 2021. The transaction closed on October 13, 2021. The total consideration paid by Plaintiffs was $29,540,409 — representing 8.18 times Xtreme's represented trailing-twelve-month EBITDA of $3,610,000 (as adjusted for the "add-backs" described below). Mouttet retained a 40% equity stake, valued at $7,302,940 at the agreed enterprise valuation of $36,843,349.

38.     On December 30, 2021, a Delayed Draw Term Loan ("DDTL") was funded to support the onboarding of new maintenance accounts that had been included in the deal's projected revenue base.

**B. The Due Diligence Materials Contained Systematic Misrepresentations**

39. During the due diligence process, Mouttet and his representatives provided to Plaintiffs and their advisors a series of financial statements, schedules, and projections that were materially false in numerous respects.

40. The core financial representations were contained in Profit & Loss statements provided on or about May 6, 2021, by Mouttet's business advisor John Olson, who is identified in due diligence materials as an "external accountant" alongside Josh Goodis.

41. Upon information and belief, Plaintiffs allege that Olson served more as a transaction and business advisor than as a tax or bookkeeping professional.

42. Those P&Ls covered Xtreme's full-year 2020 operations and the January through March 2021 period. These statements, transmitted electronically and further distributed among Plaintiffs' advisors via email in interstate commerce, represented specific revenue figures, cost of goods sold figures, and EBITDA figures that Mouttet knew to be materially misstated and false.

43. Specifically, the financial statements misrepresented Xtreme's true labor costs by excluding a substantial portion of the cash payments made to field employees through the off-books cash payroll scheme described below.

44. The inclusion of these concealed labor costs in the COGS line would have materially reduced reported EBITDA and, at the 8.18x multiple, would have resulted in a purchase price many millions of dollars lower than the $29.5 million Plaintiffs paid.

45. Also, given the gravity and nature of those representations, Plaintiffs would not have purchased Xtreme at all had they known about them.

46.     In addition to the false P&L statements, Mouttet provided a customer contract list projecting total first-year revenues of approximately $18,722,046 from 52 identified accounts plus an additional pipeline of contracts expected to convert.

47.     This list was provided in the due diligence spreadsheet and identified specific accounts — including Four Seasons at Parkland ($1,100,000 annually), Riverwalk ($2,040,000 annually), Cascata ($1,300,000 annually), Watercrest ($1,548,000 annually), Mira Lago 1 ($1,110,000 annually), Mira Lago 2 ($1,239,200 annually), Palm Meadows ($604,000 annually), and numerous others — with specific maintenance revenue rates, enhancement projections, irrigation projections, and tree work projections for each.

48.     These projections formed a critical part of the basis for the agreed purchase price multiple.

49.     The due diligence package also included an accounts receivable schedule representing $1,856,467 in collectible open receivables.

50.     Post-closing investigation revealed that approximately $1.2 million of this balance was uncollectible or fictitious due to Mouttet's practice of issuing duplicate invoices to residential accounts and billing for work performed for personal associates who never paid — or who paid Mouttet directly in cash.

51.     The equipment list provided during due diligence itemized over 20 trucks (identified by VIN, make, model, mileage, and year), over 10 trailers (identified by VIN and size), and over 20 commercial-grade mowers (identified by serial number and specifications) as Xtreme-owned assets. Post-closing inspections revealed that the list included non-functional vehicles, vehicles belonging to other companies or individuals, scrap-condition assets, and items subject to

financing obligations that Mouttet represented as fully paid off, including Big Shot Rides vehicle financing obligations that remained outstanding.

52.     While concealing the labor scheme, Mouttet provided Plaintiffs' advisors with an "add-backs" schedule purporting to identify all owner-discretionary and personal expenses he had run through the business.

53.     This schedule, received by the buyer's broker on or about April 2, 2021 and transmitted electronically to Plaintiffs' advisors, identified $186,619.71 in purported add-backs including: his personal BMW lease and service ($16,248.31 + $8,471.17 + $591.84); Kelli Mouttet's personal gas expenses ($2,121.98); Big Shot Rides ($5,000); personal health insurance ($17,763.13); personal car insurance ($11,289); personal FPL home utilities ($4,852.44); meals and entertainment ($24,282.65); and other personal expenses.

54.     This carefully curated schedule was designed to create the impression that Mouttet had fully disclosed all personal uses of company funds and expenses that needed to be added back for EBITDA normalization purposes. The labor manipulation, which dwarfed these disclosed add-backs, was not disclosed anywhere in the add-backs schedule or elsewhere in the due diligence materials.

55.     Mouttet also concealed from Plaintiffs certain verbal commitments and agreements he had made with employees, including guaranteed-hour commitments to high-cost field supervisors, verbal bonus promises, and side arrangements with the residential division head Donny Weston.

56.     These undisclosed commitments created substantial undisclosed liabilities that were triggered post-closing.

## C. The Off-Books Cash Payroll Scheme

57.     Champion Lawn & Garden, LLC is a Florida limited liability company that Mouttet controlled and formed in or about 2010 — years before the relevant transaction. Champion operated under Mouttet's ownership and control using the trade name "Xtreme Landscaping." Post-closing, Champion was repurposed by Mouttet as a vehicle for extracting value and embezzling funds from the acquired company through fictitious or inflated materials invoicing, as described in Section D below.

58.     Beginning at least as early as 2020 and continuing through the period of due diligence, Mouttet caused Xtreme to pay a substantial number of its field employees in cash, outside of the company's formal payroll system. Every Friday, cash was prepared at Mouttet's personal residence — where multiple employees independently reported he maintained a safe containing large amounts of cash — placed into envelopes with individual employees' names written on the outside and brought to the Xtreme office for distribution by Kelli Mouttet or designated office staff. Employees were booked for forty regular hours in the formal payroll system; all additional hours worked — sometimes ten to twenty hours per week per employee — were paid in cash at straight-time rates, without overtime premium, without tax withholding, and without any paper trail. Certain employees were classified as 1099 independent contractors to further avoid employer payroll tax and overtime obligations, and some workers received no tax documentation of any kind.

59.     These cash payments were not reported through Xtreme's payroll processor, were not subject to payroll taxes, workers' compensation calculations, or other employer obligations, and did not appear in Xtreme's QuickBooks general ledger as labor costs.

60.     The source of the cash used for these off-books payroll payments is presently unknown to Plaintiffs. Multiple witnesses have independently reported that Mouttet maintained a safe at his personal residence containing large amounts of cash.

61.     The cash did not come from Xtreme's bank accounts or formal payroll system, and Plaintiffs have been unable to trace its origin from the records available to date. Mouttet's and Champion's financial records and other documents have been subpoenaed in the Xtreme bankruptcy proceeding (Case No. 2:24-bk-00747-FMD), but Mouttet and Champion have refused to comply with that subpoena.

62.     Plaintiffs reasonably believe that discovery in this action will reveal that the cash was obtained through illicit means.

63.     The primary EBITDA inflation resulted from the off-books overtime labor paid in cash that never appeared in Xtreme's P&L at all.

64.     Revenue was recognized for all the work those overtime hours produced — because the customer contracts and invoices captured the full scope of work performed — but the cost of performing that work was entirely absent from Xtreme's financial statements.

65.     With 216 hourly workers, if even half worked 10 unbooked hours per week at $15–20/hour, that would represent $800,000 to $1,000,000 per year in real labor cost that never touched Xtreme's financial statements. At the 8.18x purchase multiple, that represents a conservative estimate of $6.5 to $8 million of inflated purchase price from this mechanism alone.

66.     Plaintiffs have obtained reliable eyewitness testimony of Xtreme employees with direct firsthand knowledge of Defendants' practices with respect to payroll, human resources,

employee onboarding, and invoice processing, Defendants' cash-payment scheme, and the Champion transactions.

67.     That testimony, corroborated by documentary and other evidence in Plaintiff's possession and to be obtained in discovery in this case, will establish the following: (a) cash payments to field employees were made every Friday, distributed in envelopes with each employee's name written on the outside, prepared at Mouttet's home and distributed at the Xtreme office by Kelli Mouttet and/or other staff; (b) when Kelli Mouttet had not prepared the envelopes in advance, she brought the cash loose to the office in a bag for on-site distribution; (c) the cash payments represented overtime hours — employees were booked for forty regular hours in the payroll system, and all additional hours were paid in cash at straight time rates, without tax withholding, overtime premium, or any paper trail; (d) some workers were classified as 1099 independent contractors to avoid employer payroll tax obligations and overtime requirements, while others received no tax documentation of any kind and were paid entirely in cash off the books; (e) after the October 2021 closing, Champion invoices were entered into the acquired company's QuickBooks system as "materials" purchases rather than as related-party transactions — a classification that concealed Mouttet's self-dealing and the extraction of company funds to an entity he personally controlled; (f) multiple employees independently reported that Mouttet maintained a safe at his personal residence containing large amounts of cash used for these payments; (g) one employee confronted Mouttet about the cash payment practices and the improper 1099 classifications, and Mouttet dismissed the employee's concerns, stating he had "been doing this for a while"; and (h) that employee was deliberately excluded from the payroll process for the first five to six months of employment, which the employee understood in

retrospect as a deliberate effort to prevent that employee from seeing the books during the transition period.

68.     Consistent with the post-closing Champion defalcation/embezzlement scheme described in Section D below, the Champion financial relationship with the acquired company continued after the October 13, 2021 closing. On February 14, 2022, a refund check made out to "Champion - IFPS" was deposited into Xtreme's bank account, demonstrating that Champion's financial relationship with Xtreme extended into the post-close period. "IFPS" is an unidentified designator that may refer to a subsidiary, division, or program within Champion.

69.     The refund nature of this payment suggests the original Champion invoice may have been identified as improper, triggering a partial return.

70.     This transaction is direct evidence that Champion remained an active instrument of Mouttet's financial dealings with the acquired company after closing.

**D. Post-Closing Champion Scheme**

71.     After the October 2021 closing, Mouttet remained in an operational management role at the acquired company while holding his 40% equity through Champion. In this position, he had authority or influence over vendor payments, QuickBooks entries, and operational expenditures. Mouttet exploited this position by causing the acquired company to continue paying Champion for purported "materials" — supplies purportedly used in landscaping operations — that were either never delivered at all or were invoiced at inflated prices.

72.     By coding these payments as "materials" — a routine, high-volume cost category for a landscaping company — the payments avoided scrutiny. Mouttet controlled Champion as the

receiving entity, meaning the cash ultimately flowed from the company's operating accounts into his own pocket through an entity he owned and controlled.

73.     That scheme constitutes, *inter alia*, self-dealing and breach of fiduciary duty: an officer and equity holder causing the company to pay his own entity for goods or services that were not delivered, not needed, and/or priced above market.

74.     The company's QuickBooks system — where these materials entries were recorded — is administered by Windham Brannon, the outside accounting firm for Plaintiffs' investment management entity. Windham Brannon had written access to the QuickBooks system. The company also used an operational software system called Aspire for job quoting, work orders, and materials tracking.

75.     The Aspire system transferred to the buyer during the transaction and contains operational records from Mouttet's management period, including job-level data showing materials actually quoted, ordered, and used on specific projects. Cross-referencing Aspire job records against Champion "materials" invoices in QuickBooks will reveal whether the invoiced materials correspond to actual operational needs or are fictitious.

76.     Due diligence materials for the deal show a "Materials" line of $1,832,229 and a "Subcontractor" line of $598,841 in cost of goods sold. Post-closing, these same QuickBooks categories remained available to Mouttet.

77.     The "materials" classification was particularly effective concealment because materials purchases are intuitive for a landscaping company and attract less scrutiny than unusual vendor payments; materials are not subject to payroll tax inquiries, workers' compensation audits,

or related-party transaction review; and the volume of legitimate materials purchases in a 200+ employee landscaping operation provides natural cover for fraudulent invoices.

78. Plaintiffs believe that discovery in this action, including Mouttet's financial records (which he has refused to produce in response to a subpoena in the Xtreme bankruptcy proceeding), will more completely reveal the nature, extent, and duration of Defendants' use of Champion to extract value from the acquired company after the closing.

**E. Additional Pre-Sale Misrepresentations**

79. In addition to the schemes described above, Mouttet made or caused to be made the following specific material misrepresentations and omissions during the due diligence process:

- **Accounts Receivable:** The $1,856,467 accounts receivable balance represented in the due diligence package as fully collectible was materially overstated. Mouttet had caused Xtreme to issue duplicate invoices to certain residential accounts, bill for work performed for personal associates who never intended to pay through Xtreme's normal invoicing process and carry fictitious or stale balances. In addition, the transition from QuickBooks to Aspire — an operational software platform Mouttet was implementing to emulate the systems used by larger competitors — resulted in accounts receivable data being migrated from the old QuickBooks system into Aspire while current balances were simultaneously being entered, creating widespread duplicate entries that further inflated the AR balance presented to Plaintiffs. Approximately $1.2 million of the represented AR balance is uncollectible as of the date of this filing.

- **Equipment List Misrepresentations:** The equipment list provided during due diligence, including vehicles identified by specific VIN numbers, included assets that were non-

functional, belonging to third parties, or in scrap condition. Post-closing inspection revealed significant discrepancies between the represented fleet and the actual operational fleet.

- **Big Shot Rides Financing:** Mouttet represented that vehicle financing obligations to Big Shot Rides had been paid off prior to closing. These obligations continued post-closing, representing undisclosed liabilities that Xtreme was required to service.

- **Residential Account Receivables:** Certain large residential accounts listed in the AR schedule were billed for work performed for Mouttet's personal connections who never intended to pay through normal channels. Some payments from these accounts went directly to Mouttet personally in cash.

- **Pipeline Representations:** The specific accounts Mouttet cited as imminent in his March 2021 letter — including the $3.5 million "Tradition" account and the six named million-dollar accounts waiting on James Schumacher — either did not materialize or were misrepresented as to their likelihood of conversion.

## II. Post-Closing Asset Misappropriation and Breach of Fiduciary Duty

### A. Overview of Post-Closing Diversions

80.     Following the October 13, 2021, closing, Mouttet retained the position of Chief Executive Officer of Xtreme under the terms of the Purchase Agreement. As CEO, Mouttet owed fiduciary duties of loyalty, care, and candor to Xtreme and to the Plaintiffs as the company's majority owners.

81.     Mouttet systematically breached those duties by converting company assets, granting himself salary increases without required approvals, diverting company revenues, and

causing Xtreme to bear personal and unauthorized expenses for his own benefit and the benefit of his family and associates. Xtreme's accounting records document these diversions in the company's "Due from Related Party" account (account #16905), which accumulated a balance of $1,105,200.07 by February 16, 2023 — all representing Mouttet's unpaid obligations to Xtreme arising from his unauthorized use of company funds.

**B. Documented Diversions from Xtreme's "Due from Related Party" Ledger**

82. Xtreme's accounting records establish the following specific unauthorized transactions and diversions, among others:

- **Children's Soccer Fees (November 23, 2021):** Within weeks of the closing, Mouttet caused Xtreme to pay $2,315.50 in registration and program fees for his children's soccer activities at a local facility, charged across six separate transactions to the company's credit card. These charges were coded to the Due from Related Party account rather than to any legitimate business expense, confirming that even Xtreme's own bookkeeper recognized these as personal obligations of Mouttet.

- **Personal Legal Fees (August 24, 2022):** Mouttet caused Xtreme to wire $10,000 to the Shir Law Group Trust Account for his personal legal representation — not for Xtreme's corporate matters — as reflected in the company's bank records with the memo "Matt's personal legal."

- **Associate's Legal Fees (December 9, 2022):** Mouttet caused Xtreme to wire $6,508.21 to City National Bank of Florida for the personal legal fees of Bryan Craig Vaughan, the Director of Operations, as reflected in the company's transaction records.

- **Xtreme Landscaping HD — Competing Enterprise (2022):** In or about March 2022, at Mouttet's instigation and with Mouttet's personal financial backing, Donny Weston departed Xtreme and formed a competing residential landscaping company called "Xtreme Landscaping HD." Internal Xtreme documents and the company's Timeline records confirm that this competing enterprise was funded by Mouttet. Despite funding and supporting a direct competitor, Mouttet caused Xtreme to absorb enormous costs associated with Xtreme HD's operations, including: (i) $290,673 in Tee-Off Temps temporary staffing invoices, reclassified in December 2022 from company expenses to the Due from Related Party account with the notation "temps used for Xtreme HD, Matt's spun out Home Division"; (ii) equipment rental costs of approximately $197,545 for September through December 2022, similarly reclassified with the notation "Rentals - Core"; (iii) $20,000 in fuel costs reclassified as attributable to Matt's Xtreme HD; and (iv) two direct checks totaling $100,000 paid from Xtreme's bank accounts to Donny Weston's competing enterprise (Check #1080 for $76,000 on September 12, 2022, described as "partial payment to invoice 2689"; and Check #1083 for $24,000 on October 5, 2022, described as "final balance").

- **Dump Fees — Boynton Beach Property (December 31, 2022):** Mouttet caused Xtreme to pay $40,360 in dump fees for the cleanup of the Boynton Beach property, with the accounting notation "Dump for cleaning up Boynton property — Matt's responsibility," confirming Xtreme's own bookkeeper characterized this as a personal obligation of Mouttet.

- **Marketing Expenditures (December 31, 2022):** Mouttet caused Xtreme to pay $2,575 for marketing described as "marketing for commercial — Matt," reclassified to the Due from Related Party account as his personal obligation.

- **Personal Home Landscaping (ongoing):** Mouttet regularly directed Xtreme employees and equipment to perform landscaping maintenance and improvements at his personal residence, using company labor and materials valued at over $100,000 without compensation to Xtreme.

- **Mira Lago Payment Diversion:** Mouttet intercepted a payment from a Mira Lago customer account, retaining a portion of the payment on the claimed (and disputed) basis that his personal employee "Donny" had performed work after his departure, despite the fact that Xtreme paid for all associated materials.

- **KHOV/Four Seasons Irrigation Payment Diversion:** Mouttet directly collected from KHOV an irrigation payment for work performed at the Four Seasons account and diverted those funds for his personal use rather than remitting them to Xtreme.

- **Unauthorized Equipment Disposition — Commercial Mower:** Mouttet transferred a commercial mower valued at approximately $25,000 to a competitor, Southern Exposure Landscape, without authorization from Xtreme's board or the Plaintiffs.

- **Unauthorized Vehicle Purchase — Bryan Vaughan Truck:** Mouttet directed Xtreme to finance the purchase of a $95,000 Ford Super Duty truck for Bryan Vaughan, the Director of Operations, without written agreement, board authorization, or disclosure to the Plaintiffs.

- **Kelli Mouttet's Compensation (ongoing):** Mouttet maintained Kelli Mouttet on Xtreme's payroll at approximately $40,000 to $45,000 per year. While Kelli Mouttet participated in the distribution of cash payroll envelopes to employees prior to and around the time of the sale, she performed no material services for the company following the closing, constituting a diversion of company funds to his spouse without business justification.

- **Personal Expenses — Reality TV and Photo Studio:** Mouttet caused Xtreme to pay thousands of dollars for personal entertainment projects including a reality television production and a personal photo studio without business purpose or board authorization.

- **Amex Charges:** Mouttet caused Xtreme to pay substantial personal American Express charges on multiple occasions, including AMEX ACH payments of $299,000 (January 10, 2022) and $342,028.71 (February 24, 2022) that were improperly classified and bore significant personal components.

**C. Tee-Off Temps Escalation**

83. Prior to the October 2021 acquisition, Xtreme's expenditures on Tee-Off Temps temporary staffing were negligible — approximately $0 in the years preceding close. Post-closing, Tee-Off Temps invoices escalated to over $200,000 per month. The December 2022 reclassification entries in Xtreme's books confirm that at least $290,673 of the Tee-Off Temps charges were not for legitimate Xtreme operations but were instead used to staff Mouttet's competing residential enterprise, Xtreme Landscaping HD. Mouttet has not satisfactorily explained the balance of the Tee-Off Temps escalation, which suggests further diversion of company funds.

84. Plaintiffs have reason to believe that Mouttet and/or one or more of the other Defendants had a financial interest (whether direct or indirect) in Tee-Off Temps.

**D. The Equipment Rental Cost Explosion**

85. Post-closing, Xtreme's equipment rental costs increased dramatically. Fred Levine, who served as Xtreme's fleet director, was unable to provide enterprise account documentation or

itemized rental records sufficient to explain the escalation. The December 2022 year-end accounting adjustments reclassified approximately $197,545 in equipment rental charges from Xtreme's operating expenses to the Due from Related Party account, confirming that these rentals were not for Xtreme's business operations but for Mouttet's related residential enterprise.

### III. The Mail Fraud Scheme — Interception of Customer Payments

86.     In addition to the direct diversions described above, Mouttet engaged in a mail interception scheme designed to create artificial cash shortages in Xtreme's accounts, interfere with the company's operations, and divert customer payments for his personal benefit.

87.     Following the October 2021 closing, Xtreme began experiencing unexplained interruptions in the collection cycle from certain recurring maintenance accounts. Collections that had historically been received on regular schedules were inexplicably paused for extended periods, despite Xtreme continuing to perform services under the relevant contracts.

88.     Multiple Xtreme employees reported to management that Mouttet was intentionally holding customer payments and causing mail to Xtreme's business addresses to be stopped or delayed. These reports were sufficiently serious that Xtreme's management installed a Ring video camera at the company's mailbox. Following installation of the camera, the mail disruption ceased.

89.     The mechanism of this scheme involved Mouttet's interception of customer checks delivered by United States Mail to Xtreme's business address, and either retaining those checks, depositing them into an account other than Xtreme's, or delaying their processing to manufacture false evidence of poor account performance that could be used to justify his actions or to pressure the Plaintiffs. In at least one documented instance, an Xtreme employee investigated a missing customer payment in the range of $15,000 to $20,000 by contacting the customer directly and

obtaining bank records confirming that the check had been deposited into Mouttet's personal bank account rather than Xtreme's operating account.

90.    Each intercepted customer check constitutes a separate predicate act of mail fraud under 18 U.S.C. § 1341, inasmuch as Mouttet devised and executed a scheme to obtain money by false pretenses using the United States Postal Service.

91.    In addition to customer payments, Mouttet directed that workers' compensation insurance correspondence, renewal notices, and other critical business mail be sent to a P.O. box that he personally controlled, rather than to the Xtreme office.

92.    Mouttet assigned designated individuals to retrieve mail from the P.O. box. When Xtreme's workers' compensation insurance lapsed — a fact discovered only after a field employee was injured on the job and an HR employee contacted the insurance carrier to file a claim — the carrier confirmed that multiple renewal notices had been sent to the P.O. box address on file. Mouttet denied receiving any notices. Operating a company with over two hundred field employees without workers' compensation coverage exposes the company and its principals to severe civil and criminal liability under Florida law.

93.    That HR employee immediately ordered a cessation of field operations upon discovering the lapse and notified the investor group. The Florida Department of Revenue subsequently visited the Xtreme office to investigate the lapse.

**IV. Post-Closing Performance and the EBITDA Collapse**

94. The post-closing financial performance of Xtreme under Mouttet's continued leadership was catastrophic and inconsistent with the financial picture he had presented during due diligence.

95. Xtreme's actual monthly EBITDA in the first year following the October 13, 2021, closing was deeply negative on a reported basis. By January 2022, reported EBITDA had fallen to negative $493,389. By April 2022, EBITDA remained deeply negative at negative $257,726.

96. The company continued to generate negative EBITDA through mid-2022 across multiple consecutive months — a performance profile entirely inconsistent with the $3,610,000 annual EBITDA ($300,833 monthly) that Mouttet represented during due diligence.

97. Adjusted EBITDA calculations prepared by the Plaintiffs' accounting team, which added back one-time onboarding costs, strategic hiring costs, and extraordinary expenses, still revealed that the company's underlying performance was materially below representations.

98. Notably, the Plaintiffs' post-close management team was able to negotiate contract price increases with 19 major accounts totaling $1,288,757 in additional annual revenue — demonstrating that Xtreme's pre-close contract pricing across its major accounts had been systematically set below prevailing market rates. Among the accounts receiving significant post-close rate increases were: Riverwalk (+$193,300 annually), Valencia Shores (+$192,999 annually), Pines of Delray (+$135,999 annually), Four Seasons (+$117,662 annually), MiraLago Estates (+$129,999 annually), and Watercrest (+$102,596 annually).

99. The ability of new management to secure these increases promptly after closing demonstrates that the pre-close rates were not the product of market conditions but rather Mouttet's

deliberate pricing strategy — and raises serious questions about whether the below-market rates reflected an undisclosed scheme to artificially inflate account retention metrics while suppressing per-account margins.

100.    In addition, the Boynton Beach yard acquired through the Treasure Coast transaction had significant undisclosed deficiencies. Accounts from the Treasure Coast acquisition were substantially not retained, suggesting that the account base used to value the Treasure Coast purchase — and which was incorporated into Xtreme's represented customer list for the 2021 transaction — was materially overstated.

## V. Key Personnel Failures and the Mouttet Resignation Letters

101.    The personnel represented to Plaintiffs as critical to Xtreme's operations and growth trajectory rapidly departed post-closing, depriving the company of the management bench that had been a key element of the investment thesis:

- **James Schumacher (President):** Departed or was terminated in January 2022, less than three months after closing. Mouttet had represented Schumacher — a former senior executive at Castle Group, one of the largest property management companies in Florida, whom Mouttet described as having "insane reach" in the industry and the ability to bring in accounts "immediately" — as a transformative executive who was already generating new account pipeline. Schumacher had direct knowledge of Xtreme's cash payroll practices and, together with one or more other Xtreme employees, confronted Mouttet about the need to bring compensation practices into compliance. Schumacher's almost-immediate departure eliminated the human capital that Mouttet had touted as central to the company's projected growth.

- **Donald Burns Weston (VP of Design):** Mouttet's childhood friend since high school, Weston departed in February/March 2022 to found Xtreme Landscaping HD, the competing residential enterprise that Mouttet personally funded. Xtreme HD focused on enhancements — the higher-margin specialty work of installing plantings, irrigation features, and landscaping improvements — which represents the most profitable segment of commercial landscaping. Employees who were still on Xtreme's payroll were performing work on HD jobs, while Xtreme bore the labor costs. Weston departed with a team of high-salaried, guaranteed-hour employees whose positions had not been disclosed as containing guaranteed-hour commitments during due diligence. When Weston later returned briefly and then departed again, he took additional employees and generated further operational disruption. Upon information and belief, Weston has stated that if Mouttet attempts to implicate him, he has "all his receipts" — an acknowledgment that the transactions between Mouttet and Weston involve conduct warranting documentation and self-protection.

- **Hector Rivera (Chief Estimator):** Described in Mouttet's own due diligence materials as a "wizard at estimating," Hector was frequently absent post-closing, unable to perform his stated functions, and eventually departed. His departure left Xtreme's estimating and tree crew operations severely understaffed.

- **Bryan Craig Vaughan (Director of Operations):** Vaughan was recruited from Yellowstone Landscaping, where he had served as a branch manager, and was instrumental in recruiting other Yellowstone personnel to Xtreme — a solicitation campaign that prompted Yellowstone to send cease-and-desist letters and invoke non-compete provisions, though enforcement proved difficult because Vaughan arranged for others to make the direct recruitment contacts. Despite receiving a large post-closing bonus and the unauthorized $95,000 truck described

above, Vaughan was unable to produce a budget after closing and demonstrated significant operational deficiencies in managing equipment procurement and vendor relationships, including with respect to the Tee-Off Temps contract escalation.

102.    Mouttet submitted his first resignation letter on October 19, 2022. He subsequently submitted a second resignation letter in May 2023. Each resignation letter was drafted at Xtreme's expense — the legal fees for drafting his first resignation letter were charged to Xtreme's accounts rather than paid personally by Mouttet.

## VI. The Xtreme Bankruptcy — Mouttet's Fraud Leaves Xtreme Insolvent

103.    The cumulative effect of Mouttet's pre-closing fraud and post-closing diversions was to render Xtreme insolvent. On May 24, 2024, Xtreme filed a voluntary petition for Chapter 11 relief in the United States Bankruptcy Court for the Middle District of Florida, Case No. 2:24-bk-00747-FMD, signed by Glen Devane, the Interim Controller installed by MSouth after Mouttet's removal.

104.    Xtreme's petition disclosed estimated assets of $1,000,001 to $10,000,000 against estimated liabilities of $10,000,001 to $50,000,000 — a deeply insolvent balance sheet reflecting the systematic looting described herein.

105.    The bankruptcy creditor matrix and claims register reveal facts of critical significance. First, the debtor's creditor matrix (compiled by Xtreme's Interim Controller from the company's books and records) listed Champion Lawn & Garden, LLC under the trade name "Champion Lawn & Garden, LLC d/b/a Xtreme Landscaping," in care of Mouttet's personal law firm Shir Law, Boca Raton, Florida. The fact that Xtreme's own business records identified Champion as operating under the Xtreme Landscaping trade name confirms that Mouttet's entity

was using Xtreme's identity. Champion subsequently filed a proof of claim in the bankruptcy proceeding, the exhibits to which further confirm Champion's use of the "d/b/a Xtreme Landscaping" designation.

106.    Second, Champion — Mouttet's entity — filed a proof of claim as a creditor of Xtreme, asserting monetary claims against the very company Mouttet had systematically looted. Any recovery on Champion's claim should be subject to setoff and counterclaims by the bankruptcy estate to the full extent of damages caused by Mouttet's fraud.

107.    Third, Tee-Off Temps filed a proof of claim in the bankruptcy proceeding asserting unpaid invoices against Xtreme. Critically, the invoices and credit application attached as exhibits to the Tee-Off Temps proof of claim identify the customer not as Xtreme, but as "Champion d/b/a Xtreme Landscaping" — further confirming that Champion was the entity contracting for temporary labor under Xtreme's trade name. The fact that Tee-Off Temps is claiming money from Xtreme while the accounting records show $290,673 in Tee-Off Temps charges were diverted to Mouttet's competing enterprise Xtreme HD suggests Xtreme was billed for labor it never received — labor deployed to Mouttet's benefit.

108.    Fourth, Big Shot Rides, LLC filed a proof of claim in the bankruptcy proceeding. The invoices attached as exhibits to the Big Shot Rides proof of claim were directed to "Matt" at "Xtreme Landscaping." Moreover, the settlement agreement attached to the proof of claim identifies both the debtor and "Champion d/b/a Xtreme Landscaping" as parties, with the debtor as the sole obligor for payments — confirming that the vehicle financing obligations Mouttet represented as paid off during due diligence remained outstanding at the time of the bankruptcy filing, and that Champion's entanglement with Xtreme extended to these undisclosed liabilities.

109.    The Xtreme bankruptcy does not extinguish Plaintiffs' direct claims against Mouttet and the other Defendants. These are direct claims of the investor Plaintiffs arising from Mouttet's fraudulent inducement of the acquisition and post-closing misappropriation. To the extent any claims are asserted derivatively on behalf of the Xtreme bankruptcy estate, Plaintiffs reserve all rights to coordinate with the estate's representative.

## VII. Fraudulent Transfer of Personal Residence

110.    On or about March 11, 2022, Mouttet transferred his personal residence to the Matthew Marc Mouttet Revocable Trust, of which he is the sole trustee.

111.    This transfer was made with actual intent to hinder, delay, and defraud present and future creditors, including the Plaintiffs, as demonstrated by: (i) the timing of the transfer, months after Mouttet knew or should have known that his pre-close representations were being scrutinized; (ii) Mouttet's retention of beneficial ownership and control of the property through the trust; (iii) the absence of any legitimate consideration for the transfer; and (iv) the transfer's effect of purporting to place Mouttet's most valuable personal asset beyond the reach of creditors.

112.    The transfer is avoidable under the Florida Uniform Disposition of Community Property Rights Act and Florida's Uniform Fraudulent Transfer Act, Fla. Stat. §§ 726.105 and 726.106.

## VIII. The RICO Enterprise and Pattern of Racketeering Activity

### A. The Enterprise

113.    Matt Mouttet, Kelli Mouttet, Champion Lawn & Garden, LLC, Donald Burns Weston, Bryan Craig Vaughan, Daniel ("Danny") DeFreitas , and others known and unknown

associated themselves in fact and constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4) — specifically, an association-in-fact enterprise (the "Mouttet Enterprise") engaged in the multi-year scheme to defraud the Plaintiffs described in this Complaint.

114.    The Mouttet Enterprise has been in operation since at least 2020 and continues through the present. The Enterprise's activities affected interstate commerce through: (i) the sale of a Florida company to investors headquartered in Georgia; (ii) the use of interstate wire communications and the U.S. Mail to transmit fraudulent financial statements, representations, and closing documents; (iii) the diversion of funds owed to out-of-state investors; and (iv) the operation of a company that provides services to national real estate development companies and real estate investment trusts operating in multiple states.

**B. Pattern of Racketeering Activity — Wire Fraud Predicates**

115.    The Mouttet Enterprise engaged in a pattern of racketeering activity consisting, at minimum, of the following predicate acts of wire fraud under 18 U.S.C. § 1343 and mail fraud under 18 U.S.C. § 1341:

- **Wire Fraud — Due Diligence Financial Statements:** The electronic transmission of false P&L statements, accounts receivable schedules, equipment lists, the add-backs schedule, and customer contract projections to Plaintiffs' advisors during the 2021 due diligence process, each transmission constituting a separate predicate act.

- **Wire Fraud — March 2021 Pipeline Email:** The electronic transmission of Mouttet's March 24, 2021, letter to the deal broker containing false representations about millions in new accounts, James Schumacher's pipeline, and the "Tradition" account.

- **Wire Fraud — Closing Documents:** The electronic transmission of closing documents, representations, and certifications on or about October 13, 2021, that incorporated by reference the false financial representations made during due diligence.

- **Wire Fraud — DDTL Application:** The electronic transmission on or about December 30, 2021, of representations supporting the draw-down of the Delayed Draw Term Loan for new accounts, which representations were premised in part on the false financial picture created by the off-books cash payroll scheme.

- **Wire Fraud — Post-Close Instructions:** Electronic communications from Mouttet directing the diversion of company assets, payments to Xtreme HD, Tee-Off Temps arrangements, and other post-close misappropriations that constitute additional predicate acts.

- **Wire Fraud — Personal Legal Fee Wire (August 24, 2022):** Mouttet's direction of the August 24, 2022, wire transfer of $10,000 from Xtreme's bank account to the Shir Law Group Trust Account for his personal legal representation, made by causing Xtreme employees to execute the wire electronically.

- **Mail Fraud — Customer Check Interception (multiple predicates):** Each instance in which Mouttet intercepted or caused to be diverted a customer check delivered by U.S. Mail to Xtreme's business address constitutes a separate predicate act of mail fraud under 18 U.S.C. § 1341.

## C. Continuity

116.    The Mouttet Enterprise's pattern of racketeering activity satisfies the continuity requirement of RICO. The predicate acts span from at least 2020 (when the off-books cash payroll

scheme began distorting the financial records that would be presented in due diligence) through at least 2023.

117.    The predicate acts are related — all are connected by the common purpose of defrauding the Plaintiffs and converting company assets — and are continuous, having been committed over a period of more than three years by the same Enterprise against the same victims. Upon information and belief, Mouttet has since acquired or formed another landscaping company operating in the same geographic area of South Florida and has recruited former Xtreme employees to work for this new venture — demonstrating both a continuing pattern of conduct and the risk that assets traceable to the fraud alleged herein may be further dissipated.

**IX. The Wire Fraud, Mail Fraud, and Bank Fraud Scheme — Specific Predicate Act Transmissions**

**A. Wire Fraud Predicates — 18 U.S.C. § 1343**

118.    Wire fraud under 18 U.S.C. § 1343 requires: (1) a scheme to defraud; (2) the use of interstate wire communications; (3) in furtherance of the scheme. *United States v. Ward*, 486 F.3d 1212, 1222 (11th Cir. 2007). It is not necessary that the wire communication itself contain a false statement; it is sufficient that it be incident to an essential part of the scheme. *Pereira v. United States*, 347 U.S. 1, 8–9 (1954). The following discrete wire transmissions, each made by Mouttet or caused to be made in furtherance of the fraudulent scheme, constitute separate predicate acts:

- **November 2020 — Initial Financial Projections.** In or about November 2020, Mouttet or his agents electronically transmitted to Plaintiffs' predecessor entity initial financial projections representing 2020 net operating income of $1,291,130. These projections were transmitted with knowledge that cash payroll costs had been excluded, rendering them materially false. This interstate electronic transmission constitutes a predicate act of wire fraud.

- **April 2, 2021 — Add-Backs Schedule.** On or about April 2, 2021, the add-backs schedule purporting to disclose all owner-discretionary expenses totaling $186,619.71 was electronically transmitted to Plaintiffs' advisors. This document was a calculated deception: its apparent transparency concealed the far larger labor manipulation. The transmission of this deliberately incomplete disclosure constitutes a predicate act of wire fraud.

- **May 6, 2021 — P&L Statements.** On or about May 6, 2021, John Olson electronically transmitted the core Profit & Loss statements for full-year 2020 and January through March 2021. These statements reflected EBITDA that Mouttet knew to be materially overstated because off-books cash payroll costs had been entirely omitted from cost of goods sold. Each such transmission constitutes a predicate act of wire fraud.

- **March 24, 2021 — Pipeline Misrepresentations Email.** On March 24, 2021, Mouttet electronically transmitted to the deal broker a letter containing material misrepresentations about "millions of dollars in accounts being onboarded," six new million-dollar-plus accounts, and the imminent "Tradition" account projected at "$3.5 million base + extras." Mouttet made these representations with knowledge of their falsity in order to prevent the deal from collapsing and to induce Plaintiffs to commit to the purchase price. This electronic transmission constitutes a predicate act of wire fraud.

- **2021 Due Diligence — Customer Contract List; Accounts Receivable Schedule; Equipment Schedule.** During the due diligence process, Mouttet caused the customer contract list (projecting $18,722,046 in first-year revenues from 52 identified accounts), the accounts receivable schedule (representing $1,856,467 in fully collectible balances, of which approximately $1.2 million was uncollectible or fictitious), and the equipment list

(misrepresenting fleet condition and Big Shot Rides financing status) to be electronically transmitted to Plaintiffs and their advisors. Each such transmission constitutes a separate predicate act of wire fraud.

- **October 13, 2021 — Closing Documents.** On or about October 13, 2021, closing documents, representations, and certifications were electronically transmitted to the parties and their advisors. These deliverables incorporated by reference, ratified, and certified the accuracy of the materially false financial representations. Mouttet caused these transmissions knowing the incorporated representations to be false. Each electronic transmission of a closing document constitutes a separate predicate act of wire fraud.

- **December 30, 2021 — DDTL Application.** On or about December 30, 2021, Mouttet caused representations to be electronically transmitted in connection with the draw-down of the Delayed Draw Term Loan, representing that new maintenance accounts were being onboarded that he knew were not materializing as represented. This transmission also constitutes a predicate act of bank fraud under 18 U.S.C. § 1344, as described in Section IX.C below.

- **Post-Closing — Champion Invoice Instructions.** After the October 13, 2021, closing, Mouttet electronically directed Xtreme personnel to enter Champion invoices into Xtreme's QuickBooks system under the "materials" cost category rather than as related-party transactions, concealing his self-dealing. Each such electronic communication constitutes a separate predicate act of wire fraud.

- **Post-Closing — Xtreme Landscaping HD Funding Directives.** Mouttet electronically directed Xtreme personnel to divert company resources — including Tee-Off Temps temporary staffing charges ($290,673), equipment rental costs (~$197,545), and fuel costs

($20,000) — to Xtreme Landscaping HD, the competing residential enterprise he personally funded through Donny Weston. Each such electronic communication constitutes a separate predicate act of wire fraud.

- **August 24, 2022 — Shir Law Wire Transfer.** On August 24, 2022, Mouttet directed Xtreme employees to electronically transmit $10,000 from Xtreme's operating account to the Shir Law Group Trust Account for his personal legal representation, memorialized in bank records as "Matt's personal legal." This constitutes a predicate act of wire fraud.

- **December 9, 2022 — Vaughan Legal Fee Wire Transfer.** On December 9, 2022, Mouttet directed the electronic transmission of $6,508.21 from Xtreme's accounts to City National Bank of Florida for Bryan Vaughan's personal legal fees. This unauthorized transfer of company funds for an employee's personal benefit, without board authorization, constitutes a predicate act of wire fraud.

- **Post-Closing — Workers' Compensation Mail Redirect.** Mouttet electronically directed that workers' compensation insurance correspondence and renewal notices be redirected to a personal P.O. box he controlled. By intercepting these notices and allowing coverage to lapse, Mouttet deprived Xtreme of insurance while exposing the company to catastrophic civil and regulatory liability. Each such electronic directive constitutes a predicate act of wire fraud.

- **Honest Services Wire Fraud — 18 U.S.C. §§ 1343 and 1346.** Each of the wire transmissions described above also constitutes a predicate act of honest services wire fraud under 18 U.S.C. §§ 1343 and 1346. As CEO of Xtreme, Mouttet owed the company and its majority shareholders the intangible right of honest services. See *Skilling v. United States*, 561 U.S. 358, 400–09 (2010). Each undisclosed self-dealing transaction by which Mouttet used his position

as CEO to direct company funds to his own benefit — through Champion, through Xtreme HD, and through the direct personal expense conversions described herein — constitutes a deprivation of honest services. Each interstate wire communication in furtherance of those transactions constitutes a separate predicate act of honest services wire fraud.

## B. Mail Fraud Predicates — 18 U.S.C. § 1341

119.    Mail fraud under 18 U.S.C. § 1341 requires: (1) a scheme to defraud; (2) a mailing by the United States Postal Service or a private or commercial interstate carrier; (3) for the purpose of executing the scheme. *Schmuck v. United States*, 489 U.S. 705, 708–09 (1989). A mailing need not itself contain false representations; it is sufficient that the use of the mail be incident to an essential part of the scheme. *Pereira v. United States*, 347 U.S. 1, 8 (1954). The following discrete mailings, each made or caused to be made by Mouttet in furtherance of the scheme, constitute separate predicate acts:

- **Intercepted Customer Payment Checks — Multiple Predicates.** During the post-closing period, customer checks representing payment for Xtreme's services were delivered by United States Mail to Xtreme's business address. Mouttet intercepted these checks and diverted them for his own benefit. In at least one documented instance, an Xtreme employee confirmed through direct contact with the customer that a check in the range of $15,000 to $20,000, delivered by U.S. Mail, had been deposited into Mouttet's personal bank account rather than Xtreme's. Each customer check delivered by U.S. Mail that Mouttet intercepted, retained, or diverted constitutes a separate predicate act of mail fraud. Plaintiffs anticipate that discovery will reveal additional instances.

- **Workers' Compensation Renewal Notices — Multiple Predicates.** Mouttet directed that workers' compensation renewal notices and coverage correspondence be mailed to a P.O. box he personally controlled. The insurance carrier confirmed that multiple renewal notices were mailed to the redirected address. Each such mailing — diverted by Mouttet's direction from Xtreme's management — constitutes a separate predicate act of mail fraud. Mouttet used the U.S. Mail as an instrument to deprive Xtreme's management of material information about the company's insurance status, causing severe operational and legal harm when coverage lapsed.

- **Champion Materials Invoices — Multiple Predicates.** To the extent Mouttet caused Champion Lawn & Garden, LLC to mail invoices for fictitious or inflated "materials" to Xtreme's business address for processing and payment, each such mailing constitutes a separate predicate act of mail fraud.

- **Tee-Off Temps Billing — Multiple Predicates.** As established by the Tee-Off Temps proof of claim filed in the Xtreme bankruptcy proceedings, Tee-Off Temps invoiced identifying the customer as "Champion d/b/a Xtreme Landscaping" rather than Xtreme itself. To the extent these invoices were mailed to Xtreme's business address, each such mailing constitutes a separate predicate act of mail fraud in furtherance of the scheme to cause Xtreme to bear labor costs incurred for Mouttet's competing enterprise.

- **Due Diligence Materials — Any Mailed Transmissions.** To the extent that any of the materially false financial statements, schedules, or other due diligence materials described in Section I above were transmitted by United States Mail or private or commercial interstate carrier to Plaintiffs or their advisors, each such mailing constitutes a separate predicate act of mail fraud.

**C. Bank Fraud Predicates — 18 U.S.C. § 1344**

120.    Bank fraud under 18 U.S.C. § 1344 prohibits the knowing execution of a scheme to defraud a financial institution or to obtain money from a financial institution by means of false or fraudulent pretenses, representations, or promises. Bank fraud is an enumerated RICO predicate under 18 U.S.C. § 1961(1)(B). The following acts constitute separate predicate acts of bank fraud:

- **Delayed Draw Term Loan Draw-Down — December 30, 2021.** On or about December 30, 2021, Mouttet made or caused to be made representations to the institutional lender(s) funding the Delayed Draw Term Loan, representing that new maintenance accounts were being onboarded that he knew had not been secured as represented. The DDTL was provided by a financial institution within the meaning of 18 U.S.C. § 20. Mouttet's knowing submission of materially false representations to induce a financial institution to fund the DDTL constitutes a predicate act of bank fraud under 18 U.S.C. § 1344.**Acquisition Financing — False EBITDA Representations to Lender.** To the extent that institutional financing for the Xtreme acquisition was provided by a financial institution on the basis of financial representations incorporating the false EBITDA figures presented during due diligence, and to the extent that Mouttet knew those representations would be provided to and relied upon by the institutional lender, those submissions constitute additional predicate acts of bank fraud in furtherance of the overall scheme.

121.    Plaintiffs have retained the law firm of Byrd Campbell, P.A., and associated counsel, agreeing to pay reasonable attorney's fees for their services.

## CLAIMS FOR RELIEF

### COUNT I

### FRAUDULENT MISREPRESENTATION

*(By Plaintiffs XLG Holdings, CPC Xtreme Co-Invest, MSouth, and Xtreme Holdco against Defendant Mouttet Individually)*

122.    Plaintiffs sue the aforementioned Defendant for damages which exceed $75,000.00 for fraud.

123.    Plaintiffs incorporate by reference all preceding paragraphs.

124.    Mouttet made numerous false representations of material fact to the Plaintiffs and their advisors, including but not limited to: (a) the P&L statements, EBITDA, and add-backs schedules provided during due diligence; (b) the customer contract list and revenue projections; (c) the accounts receivable schedule; (d) the equipment list; (e) the representations in the March 2021 pipeline email regarding Schumacher's accounts and the Tradition contract; (f) the representations regarding the satisfaction of vehicle financing obligations; and (g) the representations in the closing documents incorporating all prior representations.

125.    Mouttet knew that these representations were false when made, or made them recklessly without knowledge of their truth or falsity.

126.    Mouttet made these representations with the intention that the Plaintiffs would rely upon them in deciding to proceed with the acquisition and in determining the purchase price.

127.    The Plaintiffs justifiably relied on Mouttet's representations in executing the Purchase Agreement and paying $29,540,409 for the 60% equity stake.

128. As a direct and proximate result of Mouttet's fraudulent misrepresentations, Plaintiffs suffered damages exceeding $30,000,000, including: (a) the difference between the price paid and the true value of the 60% stake; (b) post-closing losses attributable to the true cost structure being dramatically worse than represented; (c) the uncollected accounts receivable; and (d) the costs of investigation and remediation.

## COUNT II

### FRAUDULENT INDUCEMENT

*(By Plaintiffs XLG Holdings, CPC Xtreme Co-Invest, MSouth, and Xtreme Holdco against Defendant Mouttet Individually)*

128. Plaintiffs sue the aforementioned Defendant for damages which exceed $75,000.00 for fraud.

129. Plaintiffs incorporate by reference all preceding paragraphs.

130. Mouttet fraudulently induced Plaintiffs to enter into the Purchase Agreement and consummate the acquisition through the misrepresentations and omissions described in this Complaint.

131. But for Mouttet's fraudulent inducement, Plaintiffs would not have entered into the Purchase Agreement or would have done so only at a materially lower price.

132. Plaintiffs are entitled to rescission of the transaction or, in the alternative, damages equal to the benefit of the bargain.

## COUNT III

### FRAUDULENT CONCEALMENT

*(By Plaintiffs XLG Holdings, CPC Xtreme Co-Invest, MSouth, and Xtreme Holdco against Defendant Mouttet Individually)*

132.     Plaintiffs sue the aforementioned Defendant for damages which exceed $75,000.00 for fraud.

133.     Plaintiffs incorporate by reference all preceding paragraphs.

134.     Mouttet had a duty to disclose all material facts regarding Xtreme's financial condition, including without limitation: (a) the off-books cash payroll scheme and its effect on reported labor costs and EBITDA; (b) the post-closing Champion materials extraction scheme and its effect on the acquired company's financial condition; (c) the true nature and extent of the accounts receivable; (d) the true condition of the equipment; (e) the undisclosed employee compensation commitments; and (f) the material risks associated with the pipeline accounts he was touting.

135.     Mouttet concealed these material facts with the intent to deceive Plaintiffs and induce them to pay an inflated purchase price.

136.     Plaintiffs were damaged by Mouttet's fraudulent concealment in the same amounts described in Count I.

## COUNT IV

### NEGLIGENT MISREPRESENTATION

*(By Plaintiffs XLG Holdings, CPC Xtreme Co-Invest, MSouth, and Xtreme Holdco against Defendant Mouttet Individually — Pled in the Alternative)*

136.     Plaintiffs sue the aforementioned Defendant for damages which exceed $75,000.00 for negligence.

137. Plaintiffs incorporate by reference all preceding paragraphs.

138. In the alternative to Counts I through III, Mouttet, in the course of a business transaction in which he had a pecuniary interest, supplied false information for the guidance of Plaintiffs in their business transaction.

139. Mouttet failed to exercise reasonable care or competence in obtaining or communicating this information.

140. Plaintiffs justifiably relied on the information and suffered pecuniary loss as a result.

## COUNT V

### BREACH OF CONTRACT — APA INDEMNIFICATION OBLIGATIONS

*(By Plaintiffs XLG Holdings, CPC Xtreme Co-Invest, MSouth, and Xtreme Holdco as "Affiliated Parties" of the Buyer under the Asset Purchase Agreement, against Defendant Champion Lawn & Garden, LLC)*

140. Plaintiffs sue the aforementioned Defendant for damages which exceed $75,000.00 for breach of contract.

141. Plaintiffs incorporate by reference all preceding paragraphs.

142. The Asset Purchase Agreement effective October 2021 between Defendant Champion Lawn & Garden, LLC, as Seller, and Xtreme Landscaping & Grounds Maintenance, LLC, as Buyer (the "APA"), contains representations and warranties by Champion that survived Closing under APA Section 8.01.

143. Among the representations and warranties Champion made in the APA were the following: (a) APA Section 2.05 (Financial Statements) — the financial statements of Seller

delivered to Buyer were "true and correct in all material respects" and "fairly present the financial condition of Seller as of the respective dates thereof"; (b) APA Section 2.07 (Absence of Undisclosed Liabilities) — Seller had no "material debt, liability, or obligation of any nature, whether known or unknown, or fixed, absolute, accrued, contingent, or otherwise" except those accrued or reserved in the Financial Statements or specifically disclosed on the Schedules; (c) APA Section 2.11 (Employees) — Seller "has complied in all material respects with all provisions of applicable law pertaining to the employment of employees," and the employee schedule (Schedule 2.11) was "a correct list of all employees to whom Seller is paying compensation" with "the current annual rate of compensation for each employee"; (d) APA Section 2.14 (Compliance With Laws) — Seller's operation, conduct, and ownership of property and business was "in all material respects, in full compliance with all applicable federal, state, local and other (domestic and foreign) laws, rules, regulations, ordinances, and judgments and orders of any court, arbitrator or governmental authority"; and (e) APA Section 2.19 (Disclosure) — the information provided by Seller "does not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated . . . or necessary to make the statements and facts contained herein or therein, in light of the circumstances under which they are made, not false or misleading."

144.    Each of the foregoing representations and warranties was false at and as of Closing. As detailed throughout this Complaint, Champion (i) operated and concealed an off-the-books cash payroll system that materially understated Seller's labor costs and correspondingly overstated Seller's EBITDA; (ii) failed to disclose the off-books payroll obligations as undisclosed liabilities under Section 2.07; (iii) failed to list cash-paid laborers, or to identify the actual aggregate cash compensation paid to listed employees, on Schedule 2.11; (iv) failed to comply with applicable federal and state employment, wage-and-hour, payroll-tax, unemployment-insurance, workers'

compensation, and information-reporting laws; and (v) made the additional misrepresentations and omissions identified throughout this Complaint, none of which was disclosed pursuant to Section 2.19.

145.    APA Section 8.02 (Indemnification by Seller) provides that Seller (Champion) "and its successors and assigns" shall "indemnify and hold Buyer and each of its managers, members, affiliates, employees, attorneys, agents, representatives, successors and assigns (collectively, the 'Affiliated Parties') harmless in respect of any and all claims, losses, damages, liabilities, and expenses . . . incurred by Buyer or its Affiliated Parties" in connection with, among other things, "any breach of any representation or warranty by . . . Seller contained in this Agreement."

146.    Each Plaintiff is an "Affiliated Party" of Buyer within the meaning of APA Section 8.02. Plaintiff Xtreme Holdco is the direct sole member and 100% parent of Buyer. Plaintiff XLG Holdings is, currently, a 51.34% indirect member of Buyer through Xtreme Holdco (60% at Closing). Plaintiff CPC Xtreme Co-Invest is the 100% holder of XLG Holdings' common membership interests (70.52% at Closing). Plaintiff Republic Capital Corporation d/b/a MSouth Capital is the senior secured lender to Buyer under the October 12, 2021 Loan and Security Agreement (guaranteed by Xtreme Holdco), was the original 29.48% equity holder in XLG Holdings, and was contractually integrated into the governance of Xtreme Holdco under the Holdco Operating Agreement Sections 5.09, 5.10, 7.01, 7.03, 12.09, and 12.10 as further described in Paragraph 26 above.

147.    The representations and warranties identified above survived the Closing under APA Section 8.01, and Plaintiffs' indemnification claims under Section 8.02 are not time-barred.

APA Section 8.05 establishes a Five Thousand Dollar ($5,000) basket and an aggregate cap on Seller indemnification equal to the Purchase Price.

148.    APA Section 10.08 entitles the prevailing party in any legal action for the enforcement of the APA to recover reasonable attorneys' fees and other costs incurred in that action.

149.    APA Section 10.10 provides that "the exclusive venue for any dispute arising out of or relating to this Agreement shall be in the appropriate court in Palm Beach County, Florida." This Court — the United States District Court for the Southern District of Florida, West Palm Beach Division — sits in Palm Beach County, Florida, and is therefore an appropriate court within the meaning of APA Section 10.10. To the extent any Defendant disputes that Plaintiffs are bound by APA Section 10.10, Plaintiffs further plead that they were not signatories to the APA and are not bound by its venue-selection provision; Plaintiffs do not waive any objection or argument concerning the proper interpretation, enforceability, or scope of APA Section 10.10 in any other proceeding.

150.    As a direct and proximate result of Champion's breach of the foregoing representations and warranties, Plaintiffs have suffered Damages within the meaning of APA Section 8.02 in an amount in excess of $30,000,000, recoverable from Champion under APA Section 8.02 up to the Purchase Price cap of approximately $29,540,409, plus reasonable attorneys' fees and costs under APA Section 10.08, plus pre-judgment and post-judgment interest at the maximum lawful rate.

## COUNT VI

### BREACH OF FIDUCIARY DUTY

*(By Plaintiff Republic Capital Corporation d/b/a MSouth Capital, on its direct-injury theory as senior secured lender holding a perfected security interest in the collateral dissipated by the breaches alleged herein, against Defendant Mouttet as CEO of Xtreme)*

151.     Plaintiff sued the aforementioned Defendant for damages which exceed $75,000.00 for breach of fiduciary duty.

152.     Plaintiff incorporates by reference all preceding paragraphs.

153.     As CEO of Xtreme Landscaping following the October 13, 2021 closing, Mouttet owed fiduciary duties of loyalty, care, good faith, and candor to Xtreme Landscaping. Mouttet's breaches of those duties dissipated assets in which MSouth held a perfected security interest under the October 12, 2021, Loan and Security Agreement, directly injuring MSouth in its capacity as senior secured creditor independently of any injury to Xtreme Landscaping or its bankruptcy estate.

154.     Mouttet breached those duties in the numerous ways described in this Complaint, including: (a) diverting company funds for personal benefit totaling at least $1,105,200; (b) causing Xtreme to fund a competing enterprise operated by his associate Donny Weston; (c) intercepting customer payments; (d) making unauthorized dispositions of company equipment; (e) authorizing unauthorized compensation to employees; (f) charging personal legal fees, family expenses, and personal entertainment costs to Xtreme; and (g) failing to disclose any of these actions to MSouth, notwithstanding MSouth's contractual governance and observation rights described in Paragraph 26 above. Each diversion described above dissipated assets in which MSouth held a perfected security interest, and each was affected without MSouth's authorization.

155.    MSouth is entitled to compensatory damages, disgorgement of all improper benefits received by Mouttet and entitled to an accounting.

### COUNT VII

### CONVERSION

*(By Plaintiff Republic Capital Corporation d/b/a MSouth Capital, on its direct collateral-dissipation theory as senior secured lender, against Defendants Mouttet and Kelli Mouttet)*

156.    Plaintiff sues the aforementioned Defendants for damages which exceed $75,000.00 for conversion.

157.    Plaintiff incorporates by reference all preceding paragraphs.

158.    Xtreme had a right to possession of the specific property converted by Defendants, including: (a) the customer checks intercepted through the mail fraud scheme; (b) the KHOV/Four Seasons irrigation payment diverted directly by Mouttet; (c) the Mira Lago payment retained by Mouttet; (d) the commercial mower transferred to Southern Exposure; (e) the equipment, labor, and materials used at Mouttet's personal residence; (f) the Tee-Off Temps payments diverted to Xtreme HD; (g) the rental equipment costs diverted to Xtreme HD; and (h) other specific property identified herein.

159.    Defendants intentionally interfered with and exercised dominion over that property inconsistent with Xtreme's rights.

160.    Defendants' conversion caused damages to Plaintiffs in an amount to be determined at trial.

## COUNT VIII

### UNJUST ENRICHMENT

*(By Plaintiff Republic Capital Corporation d/b/a MSouth Capital, on its direct collateral-dissipation theory as senior secured lender, against Defendants Mouttet and Kelli Mouttet — Plead in the Alternative)*

161. Plaintiff sued the aforementioned Defendants for damages which exceed $75,000.00 for unjust enrichment.

162. Plaintiff incorporates by reference all preceding paragraphs.

163. In the alternative, Defendants Mouttet and Kelli Mouttet were enriched at Plaintiffs' expense through the receipt of: (a) the inflated purchase price; (b) the converted company assets; (c) the compensation Kelli Mouttet received without providing services; and (d) all other benefits described herein.

164. It would be inequitable to allow Defendants to retain these benefits.

## COUNT IX

### VIOLATION OF FEDERAL CIVIL RICO — 18 U.S.C. § 1962(c)

*(By All Plaintiffs against Defendants Mouttet, Champion, Weston, Vaughan, and John Does 1-10)*

165. Plaintiffs sue the aforementioned Defendants for damages which exceed $75,000.00 for violations of Federal Civil RICO.

166. Plaintiffs incorporate by reference all preceding paragraphs.

167. Mouttet, Champion, and John Does 1-10 are each "persons" within the meaning of 18 U.S.C. § 1961(3).

168. The Mouttet Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4), as described above.

169. Defendants conducted and participated in the conduct of the Mouttet Enterprise's affairs through a pattern of racketeering activity — specifically, through multiple acts of wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341) as detailed in this Complaint — in violation of 18 U.S.C. § 1962(c).

170. Plaintiffs have been injured in their business and property by reason of this violation. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble their actual damages, plus attorney's fees and costs.

171. Plaintiffs are direct victims of Defendants' racketeering activity, with two independent direct-injury theories. First (lender and secured-creditor theory): Plaintiff Republic Capital Corporation d/b/a MSouth Capital was directly injured in its business and property by reason of (a) Defendants' bank-fraud predicate acts under 18 U.S.C. § 1344, including the submission of materially false EBITDA representations and false new-account onboarding representations to MSouth in connection with the funding of the senior secured term loan and the December 30, 2021 Delayed Draw Term Loan draw-down; and (b) Defendants' post-closing wire-fraud and mail-fraud predicate acts that dissipated the collateral securing MSouth's loan, including without limitation the post-closing Champion materials-invoice instructions, the post-closing Xtreme Landscaping HD funding directives, the August 24, 2022 Shir Law $10,000 wire transfer, the December 9, 2022 Vaughan $6,508.21 wire transfer, the workers' compensation mail redirect, and the intercepted customer payment checks. These predicate acts and injuries arise from conduct independent of any securities purchase or sale and provide an independent basis for federal civil

RICO standing under 18 U.S.C. § 1964(c). Second (inducement theory, pled in the alternative under Federal Rule of Civil Procedure 8(d)(2)): all Plaintiffs were further directly injured by reason of Defendants' pre-closing wire-fraud and mail-fraud predicate acts in connection with the inducement of the Xtreme acquisition, including the inflated purchase price paid for the Howey-securities, the senior secured loan funded by Plaintiff MSouth on false EBITDA, and the consequent diminution in Plaintiffs' investments. The wire- and mail-fraud predicate acts described herein were specifically targeted at Plaintiffs and their advisors with the intent that Plaintiffs would rely thereon and act to their detriment. There are no indirect or remote victims asserting duplicative claims for the same injuries. Plaintiffs' direct-victim standing satisfies the proximate-cause requirements of *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268–70 (1992), as applied by the Eleventh Circuit, and is not foreclosed by *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451 (2006), or *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010).

## COUNT X
### FEDERAL RICO CONSPIRACY — 18 U.S.C. § 1962(d)
*(By All Plaintiffs against All Defendants)*

172.    Plaintiffs sue the aforementioned Defendants for damages which exceed $75,000.000 for Federal RICO Conspiracy.

173.    Plaintiffs incorporate by reference all preceding paragraphs.

174.    All Defendants conspired with each other and with other known and unknown persons to violate 18 U.S.C. § 1962(c) by agreeing to conduct and participate in the affairs of the Mouttet Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

175.	Defendants' conspiracy caused Plaintiffs to suffer damages in the manner described throughout this Complaint. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, attorney's fees, and costs.

**COUNT XI**

**SECURITIES FRAUD — SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10b-5**

*(By Plaintiffs XLG Holdings, CPC Xtreme Co-Invest, and MSouth against Defendant Mouttet Individually — 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5)*

176.	Plaintiffs sue the aforementioned Defendant for damages which exceed $75,000.00 for securities fraud.

177.	Plaintiffs incorporate by reference all preceding paragraphs.

178.	The equity interests acquired by Plaintiffs in the Xtreme transaction — specifically, the 60% equity stake in Xtreme Holdco, LLC purchased for $29,540,409 — constitute "investment contracts" and therefore "securities" within the meaning of Section 2(a)(1) of the Securities Act of 1933 and Section 3(a)(10) of the Securities Exchange Act of 1934, as interpreted by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). The investment satisfies each element of the Howey test: (a) Plaintiffs invested substantial sums of money ($29,540,409 in aggregate); (b) the investment was in a common enterprise — Xtreme Landscaping & Grounds Maintenance, LLC — whose financial performance directly determined Plaintiffs' return; (c) Plaintiffs invested with a reasonable expectation of profits derived from Xtreme's business operations; and (d) those profits were to be derived from the essential entrepreneurial and managerial efforts of Mouttet, who retained operational control as CEO and whose skill, judgment, and integrity as the founder-operator were represented to Plaintiffs as the foundation of the investment thesis. Plaintiffs were financial investors without industry-specific expertise in commercial landscaping; no investor in

Plaintiffs' position could have exercised meaningful independent oversight of Xtreme's operations without relying entirely on Mouttet's representations.

179.    Section 10(b) of the Exchange Act makes it unlawful to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules as the SEC may prescribe. 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful to employ any device, scheme, or artifice to defraud; to make any untrue statement of a material fact or to omit to state a material fact necessary to make statements not misleading; or to engage in any act, practice, or course of business that operates as a fraud upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

180.    Mouttet made the following material misstatements and omissions, each pled with the particularity required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(1), and Federal Rule of Civil Procedure 9(b), in connection with Plaintiffs' purchase of the Xtreme Holdco equity interest:

181.    Statement A — Trailing-Twelve-Months EBITDA. In connection with Closing on October 13, 2021, Mouttet caused Champion (then doing business as Xtreme Landscaping) to deliver to Plaintiffs and their advisors Profit & Loss statements representing trailing-twelve-months EBITDA of $3,610,000, which figure was the basis for the 8.18x Cash Payment multiple under APA Section 1.02(b)(i) and the entire $29,540,409 aggregate consideration. The EBITDA figure was misleading because it omitted a substantial off-the-books cash payroll that Mouttet personally directed for years before the sale, the inclusion of which would have materially reduced reported labor cost and EBITDA. The factual basis for falsity is established by, among other sources, the forensic reconstruction of Champion's payroll undertaken following the disclosure

described in Paragraph 24 above and contemporaneous testimony of former Champion personnel familiar with the cash-envelope system.

182.   Statement B — Add-Backs Schedule. In April 2021, Mouttet caused to be transmitted to Plaintiffs and their advisors a due diligence add-backs schedule representing $186,619.71 of owner-discretionary expenses (BMW lease payments, Kelli Mouttet's personal gas charges, personal health and car insurance, and home utilities). That schedule was misleading because, by purporting to disclose all owner-discretionary expenses, it created the impression that no other material non-recurring or owner-related items remained undisclosed, while in fact Mouttet was concealing the far larger off-the-books cash payroll line item. The factual basis for falsity is established by the same payroll reconstruction and by the structural fact of selective disclosure of smaller items while omitting the materially larger one.

183.   Statement C — March 24, 2021, Pipeline E-mail. On or about March 24, 2021, Mouttet personally transmitted by interstate wire an e-mail to the deal broker representing that Champion's revenue pipeline included a single account at Tradition projected to be worth $3.5 million in annual revenue and six new accounts each exceeding $1 million attached to the involvement of James Schumacher. Each of those representations was misleading because none of the represented accounts existed in the form represented or with the revenue claimed at the time of the representation, and the Schumacher pipeline did not in substance produce the represented book of business. The factual basis for falsity is established by post-close customer review and the absence of the Tradition contract or any of the six represented accounts in actual customer-onboarding records.

184.    Statement D — Customer Contract List. In the formal due diligence package transmitted to Plaintiffs and their advisors prior to Closing, Mouttet caused a customer contract list to be represented projecting $18,722,046 in first-year post-closing revenues. That representation was misleading because a material portion of the listed contracts did not exist or had been inflated as to revenue, term, or scope. The factual basis for falsity is established by post-close revenue performance, customer-account review, and the EBITDA-collapse curve from Q4 2021 forward.

185.    Statement E — Accounts Receivable Schedule. The accounts receivable schedule in the diligence package represented $1,856,467 in fully collectible balances. That representation was misleading because at least approximately $1.2 million of that aggregate was uncollectible or fictitious. The factual basis for falsity is established by the AR write-downs taken in 2022, contemporaneous customer disputes, and the AR-aging analysis prepared after Mouttet's removal.

186.    Statement F — Equipment Schedule. The equipment schedule in the diligence package represented specific trucks, mowers, and trailers identified by VIN as Xtreme-owned and as having particular conditions and financing status. That representation was misleading because it materially misstated the condition and financing status of the listed equipment, including with respect to vehicle financing obligations and equipment encumbered by undisclosed liens. The factual basis for falsity is established by post-close equipment inspection, finance-obligation reconciliation, and lender inquiry following Closing.

187.    Statement G — Closing Representations and Certifications. At and as of the October 13, 2021, Closing, Mouttet caused Champion to make the representations and warranties set forth in APA Article II, including without limitation the representations described in

Paragraphs 198-203 above (APA §§ 2.05, 2.07, 2.11, 2.14, 2.19), each of which incorporated and ratified the foregoing misrepresentations. Those Closing representations and certifications were misleading because each of the prior misrepresentations identified above remained false and uncured at Closing. The factual basis for falsity is the same as for the underlying misstatements identified above.

188. Each of the foregoing misstatements and omissions was material — there is a substantial likelihood that a reasonable investor would have considered the omitted or misstated fact important in deciding whether to purchase the Xtreme equity stake and at what price. See *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). The EBITDA misstatement alone, driving the entire $29.5 million purchase price through an 8.18x multiple, is dispositive of materiality.

189. Mouttet made each of the foregoing misstatements and omissions with scienter — with knowledge of their falsity or with reckless disregard for their truth or falsity. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Mouttet personally designed and operated the off-books cash payroll scheme; personally caused the add-backs schedule to be transmitted as a substitute for full disclosure; personally made the March 2021 pipeline representations; and personally certified or ratified the closing deliverables. His scienter is established by the structure and operation of the scheme itself.

190. Plaintiff XLG Holdings, in its capacity as the direct purchaser of the 60% Xtreme Holdco membership interest at Closing for an aggregate consideration of approximately $29,540,409, actually and justifiably relied upon Mouttet's material misrepresentations and omissions in determining to enter the transaction, in setting the EBITDA-based purchase-price multiple of approximately 8.18x, and in funding the purchase. But for those misrepresentations

and omissions, XLG Holdings would not have entered the transaction or would have required materially different terms, including but not limited to a materially lower purchase price.

191.    Plaintiff CPC Xtreme Co-Invest, in its capacity as the upstream investor that funded XLG Holdings' acquisition by holding 70.52% of the common membership interests of XLG Holdings at Closing (and currently holding 100% of XLG Holdings' common membership interests after MSouth's redemption), actually and justifiably relied upon the same material misrepresentations and omissions in determining to fund XLG Holdings' purchase. But for those misrepresentations and omissions, CPC Xtreme Co-Invest would not have funded XLG Holdings' purchase or would have required materially different terms.

192.    Plaintiff MSouth, in its capacities as (i) the original 29.48% equityholder in XLG Holdings (purchasing such equity for $3,250,000 at Closing), (ii) the senior secured lender to Xtreme Landscaping under the October 12, 2021 Loan and Security Agreement (extending term-loan and delayed-draw-term-loan commitments aggregating $20,830,000), and (iii) a contractually-recognized governance participant under the September 9, 2021 Operating Agreement of Xtreme Holdco, LLC, as described in Paragraph 26 above, actually and justifiably relied upon the same material misrepresentations and omissions in determining to commit equity capital, to extend the senior secured loan, and to negotiate the four governance protections set forth in Paragraph 26 above. But for those misrepresentations and omissions, MSouth would not have committed its equity, extended its loan, or accepted the Loan and Security Agreement covenants and collateral package on the terms agreed.

193.    The reliance allegations set forth above are pled as actual reliance with respect to the face-to-face / private-placement transaction described herein and are not premised on the fraud-

on-the-market presumption. See Basic, Inc. v. Levinson, 485 U.S. 224, 243 (1988). Mouttet's misrepresentations and omissions were the proximate cause of Plaintiffs' losses, which exceed $30,000,000, including the difference between the consideration paid and the true value of the Xtreme equity, additional post-closing losses attributable to the true cost structure, uncollected accounts receivable, dissipated collateral securing MSouth's loan, and costs of investigation and remediation.

194.    Plaintiffs bring this claim within the applicable limitations period of 28 U.S.C. § 1658(b). Plaintiffs did not discover, and could not with reasonable diligence have discovered, the facts constituting the violations alleged herein until 2025, when a former Xtreme insider came forward and disclosed the conduct described herein, after which forensic analysis of Xtreme's payroll records confirmed and quantified the scope of the off-books cash payroll scheme.The absolute five-year repose period of § 1658(b)(2) runs from the violation and, on these facts, would expire on or about October 13, 2026 (five years from the October 13, 2021 closing of the securities transaction). Plaintiffs are therefore required to file before that date.

195.    **PSLRA Scienter – Strong Inference.** As required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2), Plaintiffs plead with particularity facts giving rise to a strong inference that Mouttet acted with scienter — an inference at least as compelling as any non-culpable alternative. See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007). Mouttet personally: (i) designed, funded, and operated the off-books cash-payroll system for years before the sale, paying wages by means he concealed from his own books; (ii) caused Xtreme's internal P&L statements to be prepared without the off-books labor cost, knowing that EBITDA (the sole driver of the 8.18× purchase-price multiple) would be materially overstated; (iii) selected which owner-discretionary items to disclose on the April 2021 add-backs schedule

— BMW, personal gas, utilities totaling $186,619.71 — while omitting the far larger labor manipulation, a pattern of selective disclosure from which deliberate concealment is the most compelling inference; (iv) personally transmitted the March 24, 2021 pipeline email representing millions in imminent onboarded revenue from the "Tradition" account and James Schumacher's pipeline, representations that were false when made; and (v) executed closing certifications incorporating the foregoing falsehoods. These particularized allegations, considered holistically, establish a strong inference of scienter at least as compelling as any innocent explanation.

196. **Loss Causation.** Plaintiffs plead loss causation as required by 15 U.S.C. § 78u-4(b)(4) and *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005). The concealed truth — off-books cash payroll, fictitious receivables, and a pipeline that was never real — directly caused Plaintiffs' loss when that truth was progressively revealed beginning in 2022 through 2025. Specifically: (i) the accounts-receivable write-downs of approximately $1.2 million in 2022 reflected the "fully collectible" representations' falsity; (ii) the failure of the represented pipeline to materialize caused the post-closing revenue shortfall; (iii) the true, higher labor-cost structure that emerged after Mouttet's removal eliminated the EBITDA on which the $29,540,409 purchase price had been set; and (iv) the cumulative effect of those revealed falsehoods forced Xtreme into Chapter 11 bankruptcy on May 24, 2024, zeroing out Plaintiffs' equity. Plaintiffs' losses are not the product of ordinary business risk but are the direct economic consequence of the misrepresentations alleged above.

197. **Purchaser Standing.** Plaintiffs have purchaser standing under *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975). On October 13, 2021, each Plaintiff named in this Count actually purchased a "security" within the meaning of the Exchange Act in connection with the Xtreme transaction: (i) Plaintiff XLG Holdings, LLC purchased the 60% Xtreme Holdco, LLC

equity interest for an aggregate consideration of $29,540,409; (ii) Plaintiff CPC Xtreme Co-Invest, LLC purchased a Howey-security in XLG Holdings, LLC — itself an investment contract under the Howey test — by funding XLG Holdings' acquisition of the Xtreme Holdco interest in exchange for a 70.52% common membership interest in XLG Holdings; and (iii) Plaintiff Republic Capital Corporation d/b/a MSouth Capital purchased a 29.48% common membership interest in XLG Holdings, LLC for $3,250,000 (since redeemed and converted to debt pursuant to the Redemption Agreement — XLG, with the redemption not affecting purchaser standing for fraud at the time of purchase). Each such purchase satisfies the *Blue Chip* purchaser-or-seller requirement for private 10b-5 standing.

**Direct, Non-Derivative Injury.** The § 10(b) injury pled here is the pre-closing fraudulent inducement of Plaintiffs' purchase of securities — a direct injury to the investor-purchasers in their capacity as buyers. It is not a derivative claim belonging to Xtreme Landscaping & Grounds Maintenance, LLC or its bankruptcy estate. See *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972). Post-closing looting claims that would belong to the bankruptcy estate are pled in separate counts or preserved for pursuit by the estate.

## COUNT XII
### FLORIDA CIVIL RICO — Fla. Stat. § 772.103
*(By All Plaintiffs against Defendants Mouttet, Champion, Weston, Vaughan, and John Does 1-10)*

198.    Plaintiffs sue the aforementioned Defendants for damages which exceed $75,000.00 for Florida Civil RICO.

199.    Plaintiffs incorporate by reference all preceding paragraphs.

200.    Defendants engaged in a pattern of criminal activity — specifically, the predicate acts of mail fraud and wire fraud constituting theft and fraudulent practices under Florida law — in violation of Fla. Stat. § 772.103.

201.    Pursuant to Fla. Stat. § 772.104, Plaintiffs are entitled to recover three times their actual damages plus attorney's fees.

## COUNT XIII

### FLORIDA RICO CONSPIRACY — Fla. Stat. § 772.103(4)

*(By All Plaintiffs against All Defendants)*

202.    Plaintiffs sue the aforementioned Defendants for damages which exceed $75,000.00 for Florida RICO Conspiracy.

203.    Plaintiffs incorporate by reference all preceding paragraphs.

204.    All Defendants conspired to violate Fla. Stat. § 772.103 through the scheme described in this Complaint, in violation of Fla. Stat. § 772.103(4).

205.    Plaintiffs are entitled to treble damages plus attorney's fees as provided by Fla. Stat. § 772.104.

## COUNT XIV

### FRAUDULENT TRANSFER

*(By All Plaintiffs as contingent/unliquidated creditors under Fla. Stat. § 726.102, against Defendant Mouttet Individually and as Trustee of the Matthew Marc Mouttet Revocable Trust)*

206.    Plaintiffs sue the aforementioned Defendants for damages and equitable relief which exceed $75,000.00 for fraudulent transfer.

207.    Plaintiffs incorporate by reference all preceding paragraphs.

208.    The March 11, 2022, transfer of Mouttet's personal residence to the Matthew Marc Mouttet Revocable Trust was made with actual intent to hinder, delay, or defraud present and future creditors, including Plaintiffs, in violation of Fla. Stat. § 726.105(1)(a).

209.    Alternatively, the transfer was constructively fraudulent under Fla. Stat. § 726.105(1)(b) and § 726.106 because it was made without reasonably equivalent value at a time when Mouttet was engaged in a business or transaction for which his remaining assets were unreasonably small.

210.    Plaintiffs are entitled to avoidance of the transfer, attachment of the property transferred, and all other relief available under Fla. Stat. §§ 726.108-726.109.

## COUNT XV
## CIVIL CONSPIRACY
*(By All Plaintiffs against All Defendants)*

211.    Plaintiffs sue the aforementioned Defendants for damages which exceed $75,000.00 for civil conspiracy.

212.    Plaintiffs incorporate by reference all preceding paragraphs.

213.    All Defendants acted in concert pursuant to an agreement or common design to accomplish the unlawful purposes described in this Complaint, including the pre-sale financial fraud, the post-closing asset diversions, and the fraudulent transfer of Mouttet's personal residence.

214.    Defendants committed overt acts in furtherance of the conspiracy, including the specific predicate acts, conversions, and fraudulent transfers detailed herein.

215.    Plaintiffs suffered damages as a direct and proximate result of the conspiracy.

## COUNT XVI

### AIDING AND ABETTING FRAUD AND BREACH OF FIDUCIARY DUTY

*(By All Plaintiffs against Defendants Kelli Mouttet, Donny Weston, Bryan Vaughan, and John Does 1-10)*

216.    Plaintiffs sue the aforementioned Defendants for damages which exceed $75,000.00 for aiding and abetting fraud and breach of fiduciary duty.

217.    Plaintiffs incorporate by reference all preceding paragraphs.

218.    Defendants Kelli Mouttet, Donald Burns Weston, Bryan Craig Vaughan, and John Does 1-10 had actual knowledge of Mouttet's fraudulent scheme and breaches of fiduciary duty.

219.    These Defendants substantially assisted Mouttet's fraud and fiduciary breach by: (a) receiving compensation to which they were not entitled from Xtreme's funds; (b) operating the Xtreme HD competing enterprise with knowledge that it was being financed by misappropriated Xtreme funds; (c) participating in the unauthorized equipment transactions; (d) accepting payment from Xtreme on invoices from the Xtreme HD competing enterprise; and (e) otherwise facilitating Mouttet's diversions.

Plaintiffs are entitled to damages against these Defendants, jointly and severally with Mouttet, for all damages caused by the fraud and fiduciary breach that they aided and abetted.

## COUNT XVII

### VIOLATION OF FLORIDA SECURITIES AND INVESTOR PROTECTION ACT — Fla. Stat. §§ 517.301, 517.211

*(By Plaintiffs XLG Holdings, CPC Xtreme Co-Invest, and MSouth against Defendant Mouttet Individually)*

220.    Plaintiffs sue the aforementioned Defendant for damages which exceed $75,000.00 for Florida securities fraud.

221.    Plaintiffs incorporate by reference all preceding paragraphs.

222.    Plaintiffs XLG Holdings, CPC Xtreme Co-Invest, and MSouth purchased "investments" or "securities" within the meaning of Fla. Stat. § 517.021 in the Xtreme transaction described herein, with such offer, sale, or purchase activity occurring in or substantially affecting commerce in the State of Florida.

223.    Fla. Stat. § 517.301(1)(a) makes it unlawful for any person, in connection with the offer, sale, or purchase of any investment or security in or from the State of Florida, directly or indirectly: (1) to employ any device, scheme, or artifice to defraud; (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary to make statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

224.    Defendant Mouttet violated Fla. Stat. § 517.301 by, among other things, making the material misstatements and omissions identified in the per-statement particularity allegations of Count XI above and by employing the device, scheme, and artifice to defraud described throughout this Complaint, in connection with Plaintiffs' purchase of the Xtreme Holdco equity interest and the related XLG Holdings equity interests.

225.    Fla. Stat. § 517.211 establishes a private right of action in favor of any person purchasing investments in violation of Fla. Stat. § 517.301 against the person making the sale and against every director, officer, partner, or agent of or for such seller who has personally participated or aided in making the sale. As the sole member, sole manager, and sole director-equivalent of Champion Lawn & Garden, LLC, and as the principal individual making and ratifying the

misrepresentations described herein, Mouttet personally participated in and aided the sale and is jointly and severally liable to Plaintiffs.

226.    Pursuant to Fla. Stat. § 517.211(2)–(3), Plaintiffs are entitled to recover, at their election: (a) the consideration paid for the investment, with interest at the legal rate, less the amount of any income received on the investment, against return of the investment; or (b) damages, plus interest at the legal rate, in the event Plaintiffs no longer own the investment.

227.    Pursuant to Fla. Stat. § 517.211(6), Plaintiffs as the prevailing parties are entitled to recover reasonable attorneys' fees and court costs, in addition to all other relief available.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1.    Compensatory damages exceeding $30,000,000, including benefit-of-bargain damages, consequential damages, lost profits, the value of diverted assets and intercepted payments, and all other actual damages proven at trial;

2.    Treble damages under 18 U.S.C. § 1964(c) (Federal RICO) and Fla. Stat. § 772.104 (Florida Civil RICO), all as applicable;

3.    Punitive damages for Mouttet's intentional fraud, fraudulent concealment, conversion, and breach of fiduciary duty;

4.    Avoidance of the fraudulent March 11, 2022, transfer of Mouttet's personal residence to the Matthew Marc Mouttet Revocable Trust, and a constructive trust on the transferred property;

5.	An order of pre-judgment attachment of all of Mouttet's assets, including the transferred residence, to prevent further dissipation pending judgment;

6.	A preliminary and permanent injunction restraining Mouttet and the Mouttet Trust from transferring, encumbering, or disposing of any assets;

7.	A full accounting of all funds diverted, misappropriated, or converted by Mouttet from Xtreme from October 13, 2021, through the present;

8.	Disgorgement of all benefits unjustly obtained by Defendants;

9.	Attorney's fees and costs pursuant to 18 U.S.C. § 1964(c) (Federal RICO), Fla. Stat. § 772.104 (Florida Civil RICO), Fla. Stat. § 517.211(6) (Florida Securities and Investor Protection Act), and the contractual fee-shifting provisions of APA Section 10.08;

10.	Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

11.	Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: May 13, 2026

Respectfully Submitted,

*s/ Tucker H. Byrd*
Florida Bar No. 381632
BYRD CAMPBELL, P.A.
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789

Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email: TByrd@ByrdCampbell.com
Secondary Email: Paralegal@ByrdCampbell.com
*Attorneys for Plaintiff*

Ryan McLemore, Esq.[1]
Thrift McLemore
1000 Parkwood Circle SE, Suite 950
Atlanta, GA 30339
Telephone: (678) 882-0830
RMcLemore@thriftlegal.com

[1]*Pro hac vice* application forthcoming
*Attorney for Plaintiff*